ANDRÉS APONTE RIVERA, ETC., demandantes y recurridos, *v.* SEARS ROEBUCK DE PUERTO RICO, INC., demandado y peticionario.

*Números:* RE-92-436 *Resueltos:* 24 de febrero de 1998
CE-92-537

*Luis Sánchez-Betances* y *Marta Elisa González*, de *Sánchez Betances & Sifre*, abogados de la parte peticionaria; *Rolando Emmanuelli Sepúlveda, Rolando Emmanuelli Jiménez* y *Rafael Emmanuelli Jiménez*, del *Bufete Emmanuelli*, abogados de la parte recurrida.

LA JUEZ ASOCIADA SEÑORA NAVEIRA DE RODÓN emitió la opinión del Tribunal, en la que expone la opinión del Tribunal en sus partes I, II y III.(*)

Hoy nuestra tarea consiste en revisar una sentencia parcial emitida por el Tribunal Superior, Sala de Ponce, que impone una responsabilidad absoluta a Sears Roebuck de Puerto Rico, Inc. (en adelante Sears) por los daños que causó la explosión de una batería de automóvil. Enmarcamos nuestra función revisora en las nociones de responsa-

---

(*) El Juez Presidente Señor Andréu García y el Juez Asociado Señor Hernández Denton se unieron a la totalidad de la opinión. El Juez Asociado Señor Fuster Berlingeri disintió en cuanto a la parte IV sobre honorarios. El Juez Asociado Señor Negrón García emitió una opinión disidente, a la cual se unió el Juez Asociado Señor Rebollo López. El Juez Asociado Señor Corrada Del Río no intervino.

Como resultado del disenso parcial del Juez Asociado Señor Fuster Berlingeri, los disensos totales de los Jueces Asociados Señores Negrón García y Rebollo López y la no intervención del Juez Asociado Señor Corrada Del Río, se confirma la concesión de honorarios por estar igualmente dividido el Tribunal.

bilidad social que han motivado al Legislador puertorri-
queño a delinear una sólida política pública de protección
al consumidor.([1])

I

*Hechos*

Allá para el 17 de agosto de 1985, el Sr. Andrés Aponte
Rivera acudió a la tienda Sears localizada en la calle Fe-
rrocarril de Ponce y allí adquirió una batería de automóvil
marca Sears Die Hard, modelo 4301. Los empleados del
taller de mecánica de dicha tienda la instalaron en el au-
tomóvil, tras revisar el regulador de voltaje, el alternador,
el arranque (*starter*), los cables de la batería y la polea del
abanico del alternador. Estos sistemas de encendido y
carga del vehículo estaban trabajando bien al momento de
la instalación.

El accidente ocurrió el 7 de julio de 1988. Ese día los
demandantes viajaban en su automóvil y se detuvieron en
una panadería. Cuando se proponían regresar a su casa, el
vehículo no encendió. El señor Aponte Rivera se bajó del
automóvil, abrió el bonete y movió con sus manos los co-
nectores de los polos de la batería. No usó herramienta
alguna, ni trató de cargar la batería. Estando frente al
vehículo, pero habiéndose retirado, le indicó a su esposa
que intentara encenderlo. Cuando ésta lo hizo, la batería
explotó. En ausencia de pasión, prejuicio, parcialidad o
error manifiesto, no intervendremos con esta apreciación
de hechos. Véanse: *Orta v. Padilla*, 137 D.P.R. 927 (1995);

---

([1]) En nuestra jurisdicción existen múltiples leyes y reglamentos dirigidos a
enfrentar los problemas o peligros que acosan al consumidor. De hecho, los esfuerzos
del Legislador puertorriqueño para enfrentar de manera efectiva los problemas del
consumidor llevaron inicialmente a la creación de la Administración de Servicios al
Consumidor, mediante la Ley Núm. 148 de 27 de junio de 1968, según enmendada,
23 L.P.R.A. sec. 1001 *et seq.* Posteriormente, al crearse el Departamento de Asuntos
al Consumidor, se le transfirieron a este nuevo organismo administrativo, entre
otros, las funciones, los poderes y los deberes de la Administración de Servicios al
Consumidor, 3 L.P.R.A. sec. 341d(a)(1).

*Rodríguez Oyola v. Machado Díaz*, 136 D.P.R. 250 (1994); *Coop. Seguros Múltiples de P.R. v. Lugo*, 136 D.P.R. 203 (1994); *Levy v. Aut. Edif. Públicos*, 135 D.P.R. 382 (1994); *Rodríguez Amadeo v. Santiago Torres*, 133 D.P.R. 785, 801 esc. 12 (1993); *Gallardo v. Petiton y V.T.N., Inc.*, 132 D.P.R. 39 (1992); *Benítez Guzmán v. García Merced*, 126 D.P.R. 302, 308 (1990); *Elba A.B.M. v. U.P.R.*, 125 D.P.R. 294, 319 (1990); *A.E.E. v. Las Américas Trust Co.*, 123 D.P.R. 834, 845 (1989); *Torres Ortiz v. Plá*, 123 D.P.R. 637, 654 (1989); *Riley v. Rodríguez de Pacheco*, 119 D.P.R. 762, 797 (1987); *Rivera Pérez v. Cruz Corchado*, 119 D.P.R. 8, 14 (1987); *Sánchez Rodríguez v. López Jiménez*, 116 D.P.R. 172, 181 (1985); *Pérez Cruz v. Hosp. La Concepción*, 115 D.P.R. 721, 728 (1984); *La Costa Sampedro v. La Costa Bolívar*, 112 D.P.R. 9, 19 (1982).

Así las cosas, el señor Aponte Rivera y su esposa, la Sra. Margarita Pérez Guadalupe, por sí y en representación de sus hijos menores de edad, Maribel, Mariel y Andrés José, instaron una demanda por daños y perjuicios contra Sears. Alegaron haber sufrido diversos daños como consecuencia de la explosión de la batería en cuestión.[2] Adujeron que los daños sufridos fueron producto de "la culpa y negligencia de la parte demandada al distribuir y poner en el mercado una batería defectuosa y en condiciones que la hicieron estallar en el momento del accidente sin que mediara ningún tipo de intervención negligente por parte del demandante". Con posterioridad enmendaron su demanda para alegar que la batería era un producto inherentemente peligroso; que Sears o el fabricante de la batería que que objeto del pleito conocían la peligrosidad de dicho producto y debieron prever los daños que podía causar; que la condición de peligrosidad no era aparente ni anticipable por

---

[2] Según surge de las alegaciones de la demanda, el señor Aponte Rivera sufrió lesiones en la cara, laceración en la córnea del ojo izquierdo y se subluxó el lente, lo que provocó que desarrollara una catarata traumática en el ojo y pérdida de visión. También surgen de las referidas alegaciones, los daños económicos y emocionales del demandante, así como los daños emocionales sufridos por su esposa e hijos.

los usuarios y consumidores de productos de tal naturaleza, y que los avisos de peligro e instrucciones que tenía la batería estaban escritos en inglés y, por lo tanto, eran inefectivos o inexistentes y constituían un defecto del producto. Sears se opuso a las enmiendas, pero el tribunal las permitió y extendió el período del descubrimiento de prueba limitándolo a lo añadido.(3)

Al contestar la demanda, Sears negó que el producto fuera defectuoso o que fuera la causa próxima de los daños que reclamaron los demandantes. Alegó que la batería objeto del pleito era, por lo menos, de igual calidad que el promedio de productos similares y que la causa eficiente de los daños reclamados fue la negligencia del demandante, o que su negligencia contribuyó en mayor grado a la causa del accidente que cualquier defecto o negligencia atribuible a ella. Además, insistió en que la naturaleza del producto y su uso, así como su mantenimiento y riesgo, eran de conocimiento del demandante; que la información colocada en la batería era suficiente y adecuada, a pesar de estar redactada en inglés; que el contenido de dichas advertencias era de conocimiento del demandante, y que éste, a sabiendas, hizo un uso inadecuado del producto, lo cual ocasionó la explosión. Continuó alegando que el demandante no leyó las instrucciones o advertencias impresas en la batería ni la información entregada durante la venta, como tampoco hizo gestiones para que se las tradujeran o se las explicaran, por lo que su ignorancia era atribuible solamente a su propia conducta.

La vista para determinar responsabilidad se celebró el

_____

(3) En su recurso de revisión, Sears Roebuck de Puerto Rico (en adelante Sears) protestó por las enmiendas a la demanda, alegando que ellas fueron presentadas un (1) año y tres (3) meses después del accidente, además de sólo seis (6) días antes de que venciera el permiso para concluir el descubrimiento de prueba. El planteamiento es inmeritorio. El tribunal de instancia tiene una amplia discreción para permitir enmiendas a la demanda, aun en etapas avanzadas de los procedimientos. Reglas 13.1 y 13.2 de Procedimiento Civil, 32 L.P.R.A. Ap. III; *Ortiz Díaz v. R. & R. Motors Sales Corp.*, 131 D.P.R. 829 (1992); *Pérez Cruz v. Hosp. La Concepción*, 115 D.P.R. 721, 737 (1984); *Clemente v. Depto. de la Vivienda*, 114 D.P.R. 763, 771 (1983); *Epifanio Vidal, Inc. v. Suro*, 103 D.P.R. 793, 795 (1975); *Srio. del Trabajo v. Vélez*, 86 D.P.R. 585, 589–590 (1962).

19 y 20 de agosto de 1991, continuando el 10, 11 y 12 de junio de 1992.([4]) Vista y evaluada la prueba, el tribunal de instancia resolvió que Sears tenía la total responsabilidad de los daños sufridos por los demandantes a raíz de la explosión de la batería.([5]) Declaró también que Sears procedió con temeridad durante la litigación del caso. Concluyó que los avisos sobre la peligrosidad del producto eran insuficientes aun para un angloparlante, ya que no existía advertencia alguna en la batería sobre la posibilidad de que con sólo mover los conectores de los polos, en circunstancias como la del caso de autos, podía producirse la referida explosión. No obstante, añadió que el demandante no pudo conocer del peligro que su conducta podía ocasionar porque las advertencias sobre la posibilidad de una explosión estaban en inglés.

Inconforme con dicho dictamen, Sears acudió mediante un recurso de revisión en el que alegó cuatro (4) errores:

Erró el Tribunal de Instancia al concluir que la insuficiencia en las advertencias de la batería era la causa adecuada de los daños sufridos por los demandantes.

Erró el Tribunal de Instancia al concluir que las advertencias de la batería eran inadecuadas para advertir al demandante de los peligros de una explosión.

Erró el Tribunal de Instancia al eximir de toda responsabilidad al demandante.

Erró el Tribunal de Instancia al concluir que la demandada fue temeraria en la litigación de este pleito.

En lo que concierne al último error, la parte demandada cuestiona la imposición de mil quinientos dólares ($1,500) en concepto de honorarios de abogado, arguyendo que sólo

---

([4]) Mediante estipulación las partes acordaron que el juicio se ventilaría en dos (2) etapas: en la primera se haría una determinación en cuanto a responsabilidad, mientras que en la segunda se fijarían los daños sufridos solo de haber mediado una determinación previa de responsabilidad.

([5]) Determinó el tribunal de instancia: "Esta batería tiene impreso, sobre su parte superior y en uno de sus lados, en letras al relieve las palabras Sears Die Hard de lo que podemos inferir que Sears ordenó la fabricación de las mismas [sic] bajo sus especificaciones o al menos el fabricante las produjo especialmente para Sears. Evidencia presentada por la demandada demostró que las baterías salen directamente de la fábrica con tales inscripciones."

ejerció su derecho legítimo a defenderse de una reclamación sobre la cual existía una controversia sustancial en términos de derecho y que sus actuaciones durante el litigio no reflejan una conducta temeraria.

De otra parte, mediante un recurso de *certiorari*, Sears cuestionó la determinación del tribunal de instancia en la cual denegó su moción para solicitar la aprobación del memorando de costas. Sostiene la parte demandada que debieron concederse las costas reclamadas conforme a lo resuelto por este Tribunal en *J.T.P. Dev. Corp. v. Majestic Realty Corp.*, 130 D.P.R. 456 (1992), por existir en este caso dos (2) causas de acción independientes: una por defectos de manufactura de la batería y otra por insuficiencia de las advertencias. Aduce que para establecer cada una de estas causas de acción se requieren distintos elementos y que fue para la defensa de la reclamación por defectos de manufactura que Sears incurrió en gastos de peritaje y deposiciones. Añade que la reclamación por insuficiencia de las advertencias descansó en otros elementos de prueba y en la aplicación del derecho a unos hechos básicos que no requerían el análisis de un perito.

Consolidamos ambos recursos y procedemos a revisar.

## II

*Responsabilidad absoluta extracontractual*

 En nuestra jurisdicción aplica la norma de responsabilidad absoluta del fabricante o vendedor por daños causados por productos defectuosos o peligrosos.[6] *Rivera et al. v. Superior Pkg., Inc. et al.*, 132 D.P.R. 115 (1992); *Montero Saldaña v. Amer. Motors Corp.*, 107 D.P.R. 452

---

[6] Nuestro Tribunal acogió la doctrina de que todos los que intervienen en la cadena de fabricación y distribución responden solidariamente con el fabricante ante el perjudicado. *Montero Saldaña v. Amer. Motors Corp.*, 107 D.P.R. 452 (1978); *Ferrer v. General Motors Corp.*, 100 D.P.R. 246 (1971). Véase, al respecto, H. Brau del Toro, *Los daños y perjuicios extracontractuales en Puerto Rico*, 2da ed., San Juan, Pubs. J.T.S., 1986, Vol. II, Cap. XVI, pág. 906.

(1978); *Mendoza v. Cervecería Corona, Inc.*, 97 D.P.R. 499 (1969). Según esta norma, el demandante tiene que probar que el producto era defectuoso y que el defecto le ocasionó un daño. Esto es, tiene que demostrar que el producto defectuoso fue la causa legal de las lesiones sufridas. *Rivera et al. v. Superior Pkg., Inc. et al.*, supra, págs. 125–126; H. Brau del Toro, *Los daños y perjuicios extracontractuales en Puerto Rico*, 2da ed., San Juan, Pubs. J.T.S., 1986, Vol. II, Cap. XVI, págs. 896–897 y 906. Sin embargo, el perjudicado no tiene que probar la negligencia del fabricante. *Rivera et al. v. Superior Pkg., Inc. et al.*, supra.[7] Ahora bien, el fabricante no es asegurador de todos los daños que puedan ser ocasionados por sus productos. *Mendoza v. Cervecería Corona, Inc.*, supra, pág. 512. Será responsable de los daños sufridos por el demandante cuando éste haya utilizado el producto para un uso razonablemente previsible. *Rivera et al. v. Superior Pkg., Inc. et al.*, supra, pág. 126. También hemos determinado que en los casos en que se impone una responsabilidad extracontractual, según la doctrina de responsabilidad absoluta, aplica la norma de la graduación de la culpa. *Montero Saldaña v. Amer. Motors Corp.*, supra, págs. 463–465.

■ Quedan incluidos en la doctrina de responsabilidad absoluta del fabricante los defectos de fabricación del

---

[7] En su alegato, Sears solicitó que reconsideráramos la norma de responsabilidad absoluta en los casos de advertencias o instrucciones insuficientes, de manera que sea de aplicación el criterio de negligencia del fabricante o vendedor. No procede su petición. En *Rivera et al. v. Superior Pkg., Inc. et al.*, 132 D.P.R. 115, 125 esc. 4 (1992), señalamos que la doctrina de responsabilidad absoluta del fabricante fue adoptada por vía jurisprudencial para llenar una laguna de nuestro ordenamiento; que hemos desarrollado dicha doctrina caso a caso, y que sería deseable que nuestra Asamblea Legislativa recopile, incorpore, adopte y desarrolle un derecho propio en el campo de la responsabilidad del fabricante. Además, destacamos que por razones de política pública la teoría de responsabilidad absoluta omite el requisito de la negligencia del demandado. Estamos conscientes de que existen diversas posiciones al respecto. Sin embargo, hasta que el Legislador no se exprese, mantendremos esta norma, ya que ésta ofrece mayor protección al consumidor. A su vez, en nuestro ordenamiento, el demandado no está desprovisto de protección ya que también acogimos el concepto de "graduación de culpa" en los casos de responsabilidad absoluta del fabricante o vendedor. *Montero Saldaña v. Amer. Motors Corp.*, 107 D.P.R. 452, 463–465 (1978).

producto,([8]) los defectos de diseño del producto([9]) y los defectos por la insuficiencia en las advertencias o instrucciones del producto.([10]) *Rivera et al. v. Superior Pkg., Inc. et al.*, supra, pág. 126; *Montero Saldaña v. Amer. Motors Corp.*, supra, págs. 461–462; Brau del Toro, *op. cit.*, pág. 901.

En *Rivera et al. v. Superior Pkg., Inc. et al.*, supra, pág. 130, expresamos que un producto es considerado defectuoso "si el fabricante o vendedor no le ofrece al usuario o consumidor aquellas advertencias o instrucciones que sean adecuadas en torno a los peligros o riesgos inherentes en el manejo o uso del producto". Añadimos que "[d]icho deber se extiende a todos los usos del producto que sean razonablemente previsibles para el fabricante". Íd.

Un producto es defectuoso porque las advertencias o instrucciones que ofrece el fabricante son insuficientes o inadecuadas: (1) cuando los riesgos de uso del producto no son aparentes ni anticipables por los usuarios o consumidores; (2) en el caso de productos inevitablemente peligrosos aunque sean útiles, o (3) cuando no se corrobora la efectividad de los avisos o las instrucciones. Brau del Toro, *op. cit.*, pág. 904.

Los objetivos al ofrecer información y advertencias sobre un producto son: (1) facilitar que el consumidor

---

([8]) Esto se refiere a cuando un producto falla en igualar la calidad promedio de productos similares, por lo que el fabricante responde por los daños resultantes de las desviaciones de la norma. *Rivera et al. v. Superior Pkg., Inc. et al.*, supra, págs. 125–126; *Montero Saldaña v. Amer. Motors Corp.*, supra, pág. 512.

([9]) Esto se refiere a cuando un producto falla en comportarse en forma tan segura como un usuario ordinario esperaría al usar el producto para el uso para el cual es destinado o para el cual previsiblemente podría ser usado, o cuando el diseño del producto es la causa próxima de los daños y la parte demandada no demuestra que, en el balance de intereses, los beneficios del diseño en cuestión sobrepasan los riesgos de peligro inherentes en el diseño. *Rivera et al. v. Superior Pkg., Inc. et al.*, supra.

([10]) Las advertencias informan al consumidor o usuario de un producto sobre sus peligros. Las instrucciones describen el procedimiento que debe seguirse para utilizar un producto de forma efectiva y segura. Las advertencias pueden ser adecuadas mientras que las instrucciones pueden ser deficientes o viceversa. 3 *Amer. Law Prod. Liab.3d* Sec. 32. 20 (1993).

lo utilice sabiamente, reduciendo el riesgo de una posible lesión, y (2) promover la autonomía individual en el proceso decisional sobre la adquisición del producto. W.P. Keeton, D.G. Owen y J.E. Montgomery, *Products Liability and Safety*, Minneola, Foundation Press, 1980, págs. 294–295.

■ La obligación del fabricante de ofrecer instrucciones y advertencias sobre un producto incluye, entre otros, el deber de: (1) ofrecer instrucciones sobre el manejo del producto; (2) advertir sobre posibles riesgos en el uso del producto, ya sean latentes u ocultos; (3) alertar sobre las consecuencias dañinas que puedan surgir al utilizar el producto de forma incorrecta, y (4) ofrecer instrucciones sobre la forma de evitar lesiones, así como instrucciones sobre el tratamiento de primeros auxilios en caso de una lesión. J.S. Allee, *Products Liability*, Nueva York, L.J. Seminars-Press, 1991, Sec. 4.06.

Lo esencial es determinar si la información provista por el fabricante o vendedor fue adecuada, tomando en cuenta la naturaleza del producto y sus posibles usos. Además, es necesario determinar si el fabricante sabía o debió haber sabido del peligro o riesgo implicado. *Rivera et al. v. Superior Pkg., Inc. et al.*, supra. La responsabilidad del fabricante depende de si las deficiencias de las advertencias o instrucciones convirtieron el producto en irrazonablemente peligroso, o sea, más peligroso que lo que esperaría un consumidor ordinario. M. Stuart Madden, *The Duty to Warn in Products Liability: Contours and Criticism*, 89 W. V. L. Rev. 221, 222 (1987); *Restatement of the Law (Second) of Torts* Sec. 402A(i) (Ap. 1965).

■ En resumen, existen cuatro (4) elementos básicos para determinar si el fabricante cumplió o no con el deber de ofrecer advertencias o instrucciones apropiadas: (1) el fabricante sabía o debió haber sabido del peligro inherente del producto; (2) no incluyó advertencias o instrucciones, o éstas no fueron adecuadas; (3) la falta de advertencias convirtió el producto en inherentemente peligroso; (4) la falta de instrucciones o advertencias apropiadas fue la causa

próxima de las lesiones del demandante. Allee, *op. cit.*, Sec. 4.02.

■ Para determinar si las advertencias o instrucciones de un producto son adecuadas se debe examinar el tamaño, el lugar y la intensidad del lenguaje o símbolo utilizado, a la luz de la forma y del contenido de éste. Las advertencias o instrucciones deben estar diseñadas en un lenguaje directo, para impresionar a un usuario prudente, y razonable del producto, alertándolo sobre la naturaleza y amplitud del peligro implicado. Stuart Madden, *op. cit.*, pág. 223.

■ Además, se tiene que analizar la naturaleza del peligro implicado, la forma en que se utiliza el producto; la carga económica que se impone al fabricante al requerirle incluir instrucciones o advertencias, y la probabilidad de que una advertencia en particular alertará de forma adecuada a los usuarios o consumidores sobre los riesgos que representa el uso del producto, ya sea correcta o incorrectamente. El contenido de las advertencias debe ser comprensible para el promedio de los consumidores. Stuart Madden, *op. cit.*, pág. 311. Esto requiere que las advertencias e instrucciones provistas por el fabricante de un producto trasciendan las barreras de lenguaje.[11]

■ En fin, el análisis sobre la adecuacidad de las advertencias y/o instrucciones debe realizarse a la luz del conocimiento o la experiencia de aquellos que razonable y previsiblemente utilizarán un producto determinado. Si el consumidor promedio no puede razonablemente anticipar

---

[11] Sobre el problema del idioma en las advertencias y/o instrucciones de los productos, véanse: L.M. Baldwin, *Ramirez v. Plough, Inc.: Should Manufacturers of Nonprescription Drugs Have a Duty to Warn in Spanish?*, 29 U.S.F. L. R. 837 (1995); T.H. Lee, *A Purposeful Approach to Products Liability Warnings and Non-English-Speaking Consumers*, 47 Vand. L. Rev. 1107 (1994); R. Geoffrey Dillard, *Multilingual Warning Labels: Product Liability, "Official English", and Consumer Safety*, 29 Ga. L. Rev. 197 (1994). C.S. Maciejewski, *The Dilemma Over Foreign Language Labeling of Over-the-counter Drugs*, 15 J. Legal Medicine, 129–154 (1994); G. Sargeant, *Drug Company Disputes Need for Warnings in Spanish*, 29 (Núm. 8) Trial 91 (1993); S.B. Goldberg, *Product Liability; Should Warnings be Bilingual*, 79 A.B.A. J., 83 (1993).

y apreciar a cabalidad las condiciones peligrosas de un producto o el riesgo a una lesión por su uso, el fabricante debe advertirlo. A la inversa, un fabricante no tiene que anunciar un peligro si el consumidor promedio ordinariamente tiene conocimiento de los peligros del producto. 3 *Am. Law Prod. Liab.3d* Sec. 32:61 (1993).

■ Ahora bien, según la doctrina de responsabilidad absoluta del fabricante, el hecho de que el peligro o riesgo al utilizar una batería de automóvil sea obvio, por ser inherente a éste, no necesariamente excluye la indemnización por daños. Una advertencia puede reducir el riesgo de daños o de lesiones, aun cuando se trate de la utilización de productos inherentemente peligrosos. *Am. Law Prod. Liab.*, supra, Sec. 32:64 Le corresponde al juzgador de los hechos examinar si, a la luz de la totalidad de las circunstancias, el aviso fue adecuado, si fue la causa próxima de los daños del demandante y si no hubo una causa interventora o concurrente.([12])

### III

*Aplicación de la doctrina*

Las baterías de automóviles son productos inherentemente peligrosos. La posibilidad de que éstas exploten, causando lesiones severas y permanentes, ha sido reconocida desde hace algún tiempo, tanto por la industria privada como por el Gobierno.([13]) De hecho, a partir de los años setenta, los fabricantes de baterías se dieron a la tarea de mejorar los diseños y de incluir advertencias para alertar a los usuarios sobre el peligro de explosión y las formas de evitar lesiones. Este esfuerzo se debió, en parte, a los nuevos reglamentos federales promulgados por el Na-

---

([12]) Véanse, por ejemplo: *East Penn Mfg. Co. v. Pineda*, 578 A.2d 1113 (1990); *Rhodes v. Interstate Battery System of America*, 722 F.2d 1517 (11mo Cir. 1984).

([13]) Anualmente se reportan miles de explosiones de baterías de automóviles. G.A. Peters, *Battery Explosions—Cause and Cure: Part II*, 18 (Núm. 7) Trial 100 (1982).

tional Highway Traffic Safety Administration (N.H.S.A.) y el Consumer Product Safety Commission (C.P.S.C.). J. Arminio, *Automobile Batteries —An Explosive Situation*, 17 (Núm. 12) Trial 54 (1981). Sin embargo, aun con los nuevos diseños y advertencias, las explosiones de baterías siguen siendo una amenaza para el público. Íd. Véanse: G.A. Peters, *Battery Explosions—. Cause and Care: Parte II*, 18 Trial 100 (1982); A. Blum, *Exploding Batteries Spur Suits*, 11 The Nat'l L.J., 6 de marzo de 1981, pág. 3. De manera que la efectividad de las advertencias e instrucciones en las baterías no ha quedado claramente establecida. Íd.

En el caso de autos, la responsabilidad absoluta impuesta a Sears por el tribunal de instancia se fundamentó en la insuficiencia e inadecuacidad de las advertencias para el manejo de la batería de automóvil, por lo que constituye un producto defectuoso. Entendió dicho foro que "en ninguna parte de la batería ni en los documentos entregados con ésta al demandante [aparecían] advertencias —ni siquiera en el idioma inglés— sobre que tocar o mover los conectores de los polos [podía] ocasionar una explosión y causarle daños".

En síntesis, la prueba pericial sirvió para establecer que al intentar la señora Pérez Guadalupe encender el automóvil, luego de que el demandante moviera los conectores de los polos de la batería, se produjo un arco o una chispa eléctrica que incendió los gases que produce normalmente la batería, ocurriendo de esta forma la explosión; que la actuación del demandante al mover los conectores de los polos de la batería cuando el automóvil no encendió representa lo que cualquier persona promedio hubiese hecho en circunstancias similares, y que las circunstancias en que ocurrió la explosión son de conocimiento en la industria manufacturera de baterías.([14])

Al tomar en consideración la prueba pericial, es forzoso concluir que el conocimiento del fabricante sobre el peligro

---

([14]) Nos referimos a la prueba vertida por el perito de la parte demandada, con experiencia por más de cuarenta (40) años como manufacturero, gerente o consultor de baterías, quien tiene a su haber tres (3) patentes de baterías.

o los riesgos implicados en circunstancias como la del caso de autos, unido al hecho de que cualquier persona promedio hubiese movido los conectores de los polos de la batería en esas mismas circunstancias, imponían al fabricante el deber de advertir a estos efectos. Veamos si se cumplió con este deber.

La parte superior de la batería que explotó tenía dos (2) tapas. Cada tapa medía 3 3/4 pulgadas de ancho por 4 pulgadas de largo y tenían, en relieve, una serie de advertencias e instrucciones relacionadas al manejo de la batería.

La tapa izquierda tenía instrucciones sobre el procedimiento para cargar la batería:

CAUTION
(1) WHEN USING JUMPER CABLES BETWEEN NEGATIVE GROUNDED BATTERIES. CONNECT ENDS OF ONE CABLE TO POSITIVE (+) TERMINAL OF EACH BATTERY.
(2) CONNECT ONE END OF OTHER CABLE TO NEGATIVE (-) TERMINAL OF "GOOD" BATTERY.
(3) CONNECT OTHER END OF CABLE TO ENGINE BLOCK ON VEHICLE BEING STARTED. (NOT TO NEGATIVE (-) TERMINAL OF BATTERY).
(4) REVERSE PROCEDURE WHEN DISCONNECTING.
NOTE: IF EITHER OR BOTH BATTERIES ARE POSITIVE (+) GROUNDED. SEE VEHICLE OWNER'S MANUAL FOR INSTRUCTIONS OR SEEK SERVICE ASSISTANCE.

La tapa derecha tenía advertencias relacionadas con el peligro de explosión por causa de alguna chispa, llama o cigarrillo y el hecho de que las herramientas y las grampas de los cables (*cable clamps*) podían ocasionar chispas. También advertía sobre la posible pérdida de visión en caso de explosión. En específico disponían:

DANGER—EXPLOSIVE
CAN CAUSE BLINDNESS OR SEVERE INJURY. PROTECT EYES. SPARKS. FLAMES. CIGARETTES CAN CAUSE EXPLOSION: TOOLS AND CABLE CLAMPS CAN CAUSE SPARKS. DO NOT USE WITHOUT INSTRUCTION. KEEP VENT CAPS TIGHT AND LEVEL.
ACID—POISON
CAUSES SEVERE BURNS. CONTAINS SULFURIC ACID. IN EVENT OF CONTACT FLUSH WITH WATER AND SEE A DOCTOR. KEEP OUT OF REACH OF CHILDREN.

Los textos transcritos que aparecían en las tapas de la batería advertían en términos generales del peligro inherente del producto; ofrecían instrucciones sobre el procedimiento para cargar la batería; aconsejaban al usuario leer el manual de instrucciones o buscar ayuda técnica en relación con cómo cargarla en determinadas circunstancias; instruían sobre mantener las tapas de la batería selladas, y ofrecían instrucciones sobre el tratamiento de primeros auxilios en caso de una lesión. De todo esto, surge con claridad que las advertencias no incluían información alguna sobre el peligro de mover los conectores de los polos de la batería, justo antes de intentar encender el vehículo. Tampoco existían instrucciones con respecto a la distancia prudente que debía guardar una persona que estuviera en las proximidades del automóvil al intentarse encender el vehículo luego de moverse los conectores de los polos de la batería, lo cual hubiera evitado lesiones.

■■■ De otra parte, los riesgos específicos asociados con el manejo de los conectores de los polos de la batería no eran previsibles ni anticipables por usuarios o consumidores ordinarios. En particular, no se presentó evidencia de que el demandante conociera o debiera conocer de los riesgos específicos asociados al manejo de la batería. Tampoco la parte demandada estableció que el demandante fuera un experto en baterías. Su experiencia previa con baterías de automóvil era la de un conductor usual. Sobre este particular cabe precisar que el conocimiento requerido para eximir al fabricante o vendedor de su deber de advertir es el conocimiento de un experto. *Am. Law Prod. Liab.3d*, supra, Sec. 32.76. Así, pues, el desconocimiento del demandante sobre los riesgos específicos implicados hace inaplicable la norma de asunción del riesgo.

Conviene señalar que el hecho de que el demandante no leyera las instrucciones resulta inmaterial a la solución del caso de autos. Cuando se incumple con el deber de informar adecuadamente, el que el demandante no lea las advertencias o instrucciones no debe ser óbice para descartar

la reclamación por daños.([15]) Aunque el demandante sí sabía que la batería era un producto peligroso y explosivo, las advertencias de la batería fueron inadecuadas por omitir la referencia a los riesgos relacionados al manejo de los conectores de los polos de ésta. Esta omisión convirtió la batería en un producto irrazonablemente peligroso, lo cual se convirtió en la causa próxima del accidente.

## IV

### *Los honorarios de abogado y las costas a la parte perdidosa*

 A. Ciertamente, la conclusión de que un litigante fue temerario descansa en la sana discreción del tribunal sentenciador. *Raoca Plumbing v. Trans World*, 114 D.P.R. 464, 468 (1983). Sin embargo, tras examinar los factores que tomó en consideración el tribunal de instancia para hacer la determinación de temeridad, concluimos que le asiste la razón al recurrente cuando insiste en que no procedía la imposición de honorarios por temeridad.([16])

> El propósito principal de autorizar la imposición de honorarios de abogado en casos de temeridad, es la de establecer una penalidad a un litigante perdidoso que por su terquedad, obstinación, contumacia e insistencia en una actitud desprovista de fundamentos, obliga a la otra parte, innecesariamente, a asumir las molestias, gastos, trabajo e inconveniencias de un pleito. *Fernández v. San Juan Cement Co., Inc.*, 118 D.P.R. 713, 718 (1987).

---

([15]) Véanse, por ejemplo: *East Penn Mfg. Co. v. Pineda*, supra; *Rhodes v. Interstate Battery System of America*, supra.

· ([16]) El tribunal de instancia determinó que la parte demandada actuó de forma temeraria en la litigación de este pleito, señalando que ésta negó varios párrafos de la demanda enmendada, ya que la información obtenida en el descubrimiento de prueba, realizado al momento de la enmienda, y el informe del perito de Sears obligaban a ésta a aceptar lo alegado en esos párrafos. Además, el tribunal de instancia indicó que la parte demandada no presentó prueba alguna para fundamentar la alegación de la defensa de prescripción. Finalmente, concluyó que factores tales como la naturaleza y duración del caso, las controversias involucradas en éste y el tiempo y la actividad profesional invertidos, obligan a la recurrente a satisfacer a los demandantes la suma de mil quinientos dólares ($1,500) en honorarios de abogado más el interés legal sobre la suma de los daños, que habrían de computarse a partir de la fecha de la presentación de la demanda.

No encontramos que las acciones de la parte deman-
dada recurrente promovieran un pleito que se pudo evitar
o lo prolongaran innecesariamente haciendo que la otra
parte incurriera en gestiones evitables. Íd., págs. 718–719.
La parte demandada no tenía que aceptar alegaciones so-
bre las cuales versaba la controversia fundamental del
caso. Además, este caso versa sobre la responsabilidad del
vendedor o fabricante por razón de la insuficiencia de ad-
vertencias, cuestión que por haber tenido poco acceso a la
jurisprudencia nos lleva a concluir que la parte deman-
dada no incurrió en temeridad punible.

A la luz de las anteriores consideraciones, procede revo-
car la imposición de honorarios de abogado por conducta
temeraria.

**B.** La Regla 44.1(a) de Procedimiento Civil, 32
L.P.R.A. Ap. III, tiene una función reparadora. El propósito
es resarcir a la parte victoriosa los gastos necesarios y ra-
zonables incurridos durante el litigio. La imposición de cos-
tas a la parte vencida es mandatoria. El tribunal, conforme
a la Regla 44.1(a), *supra,* determinará quién fue el liti-
gante vencedor y cuáles gastos fueron necesarios y
razonables. Es posible que distintas partes en el pleito sal-
gan victoriosas en una o algunas de las reclamaciones
acumuladas. *J.T.P. Dev. Corp. v. Majestic Realty Corp.,* su-
pra, pág. 461. Por ejemplo, en el caso citado existían dos (2)
reclamaciones independientes: una de reivindicación y otra
por daños y perjuicios. La reclamación por daños y perjui-
cios fue declarada con lugar mientras que la reivindicación
no prosperó. En la primera, J.T.P. resultó ser la parte vic-
toriosa, mientras que Majestic venció en la reivindicatoria.

El caso de autos no presenta el mismo cuadro. Es claro
que la parte demandante sólo tiene una reclamación por
daños causados a raíz del manejo de un producto
defectuoso. La determinación fue a los efectos de que el
producto era defectuoso por insuficiencia e inadecuacidad
de las advertencias. Sin embargo, la doctrina de responsa-
bilidad absoluta del fabricante o vendedor tiene tres (3)

modalidades: responsabilidad por defectos de fabricación del producto, defectos del diseño del producto y defectos por la insuficiencia en las advertencias o instrucciones del producto. Aunque un producto no tenga defecto de fabricación o diseño, puede ser considerado defectuoso por falta de las advertencias o instrucciones acerca de los peligros inherentes en el uso o manejo de éste. *Rivera et al. v. Superior Pkg., Inc. et al.*, supra. El tribunal de instancia concluyó que la responsabilidad de la parte demandada descansaba en la insuficiencia de las advertencias o instrucciones del producto. Consideró el testimonio pericial para evaluar todas las reclamaciones necesarias para poner fin al pleito. La parte demandante resultó ser la vencedora y, por lo tanto, no corresponde a Sears recibir reembolso alguno en concepto de costas.

Por los fundamentos antes expuestos, *se dictará sentencia confirmando la sentencia parcial emitida por el entonces Tribunal Superior, Sala de Ponce, en cuanto a la determinación de responsabilidad absoluta del demandado por los daños causados al demandante por la explosión de la batería. Como resultado del disenso parcial del Juez Asociado Señor Fuster Berlingeri, los disensos totales de los Jueces Asociados Señores Negrón García y Rebollo López, y la no intervención del Juez Asociado Señor Corrada Del Río, se confirma aquella parte de la sentencia parcial imponiendo honorarios de abogado por temeridad, por estar igualmente dividido el Tribunal. Se devuelve el caso al tribunal de Primera Instancia, Sala Superior de Ponce, para que continúe con los procedimientos en forma compatible con esta opinión.*

El Juez Asociado Señor Fuster Berlingeri emitió una opinión de conformidad en parte y disidente en parte. El Juez Asociado Señor Negrón García emitió una opinión disidente, a la cual se unió el Juez Asociado Señor Rebollo López. El Juez Asociado Señor Corrada Del Río no intervino.

— O —

Opinión de conformidad en parte y disidente en parte emitida por el Juez Asociado Señor Fuster Berlingeri.

Estoy conforme con lo dispuesto por la mayoría en este caso en lo que se refiere a la responsabilidad de la parte demandada por la explosión de la batería en cuestión que causó graves daños a la parte demandante. Disiento, sin embargo, con el dictamen de la mayoría con respecto a·los honorarios de abogado.

El caso ante nos es realmente bastante sencillo. El demandante Aponte Rivera sufrió serios daños físicos ocasionados por la explosión de la batería de su vehículo de motor. Ello ocurrió luego de que Aponte Rivera movió con sus manos los conectores de los polos de la referida batería, debido a que su vehículo no le había encendido antes cuando intentó prenderlo. Como bien señala la mayoría en su opinión, lo que causó la explosión de la batería fue precisamente que el demandante, por desconocimiento, movió los polos de la batería. Aponte Rivera hizo lo que cualquier persona hubiese hecho ordinariamente de haber estado en una situación similar. *El demandante actuó así porque las advertencias de la batería no indicaban que no se podían mover dichos polos.* En ninguna parte de la batería, ni en los documentos entregados con ésta al demandante cuando la compró, aparecían advertencias que le avisaran al consumidor que mover los conectores de los polos podría ocasionar una explosión de la batería.

Sobre lo anterior, es menester resaltar que al tribunal de instancia le mereció entera credibilidad la prueba pericial *aportada por la propia demandada* Sears Roebuck de Puerto Rico, Inc. Conforme al perito en cuestión, un experto en baterías con más de 40 años de experiencia, la causa del accidente del demandante no fue ningún defecto de la batería, sino más bien la acción de éste de mover los conectores de los polos de la batería, al no lograr encender su automóvil. *Dicho perito admitió que la referida acción*

*del demandante es lo que cualquier ciudadano promedio hubiese hecho en tales circunstancias.*

En vista de lo anterior, procede imponerle toda la responsabilidad por la explosión de la batería a la parte demandada, ya que ésta había incumplido con el deber de ofrecer al usuario advertencias e instrucciones adecuadas en torno a los riesgos inherentes a la batería, conforme a los pronunciamientos normativos de *Rivera et al. v. Superior Pkg., Inc. et al.*, 132 D.P.R. 115 (1992). Eso fue precisa y correctamente lo que resolvió el tribunal de instancia, el cual expresamente señaló que "resolvemos que Sears responde por insuficiencia en el aviso dado, aún frente a un angloparlante".

Visto que el elemento decisivo en este caso es la ausencia de aviso adecuado sobre los riesgos de mover los polos de la batería, sobre el cual no hay controversia legítima alguna, y teniendo en cuenta que la determinación de si hubo temeridad es discrecional del tribunal sentenciador, no creo que el foro de instancia abusó de sus prerrogativas al imponer honorarios de abogado. En mi criterio, éste es en realidad un caso común de daños y perjuicios, que se pudo haber resuelto sin grandes complicaciones litigiosas. Según surge de la sentencia del tribunal a quo, el perito de la parte demandada había intervenido como tal anteriormente en otros casos que trataban con situaciones similares a las de éste. Más aún, la parte demandada no presentó defensa afirmativa alguna en torno a la insuficiencia de las advertencias de la batería en cuestión, ni ofreció evidencia alguna que desvirtuara las alegaciones del demandante sobre la referida deficiencia en las advertencias. En tales circunstancias, la insistencia de la parte demandada en prolongar el pleito innecesariamente justificó la imposición por el tribunal sentenciador de honorarios de abogado, con cuya determinación este Tribunal no ha debido intervenir. Por ello, aunque estoy conforme con la parte principal de la opinión de la mayoría, disiento en lo relativo a su dictamen sobre los honorarios de abogado.

## — O —

Opinión disidente del Juez Asociado Señor Negrón García, a la cual se une el Juez Asociado Señor Rebollo López.

I

*Introducción*

> "[E]l arte del Derecho es polifónico y que, por tanto, aplicar al Derecho solamente la lógica monódica hecha para el matemático es como interpretar una sinfonía con un solo instrumento." M. Villey, citado en G. Rodríguez Mourullo, *Aplicación judicial del Derecho y lógica de la argumentación jurídica*, Madrid, Ed. Civitas, 1988, pág. 69.

En estricta juridicidad y conciencia, varias razones nos impiden suscribir la opinión del Tribunal. *Primero*, se apuntala en una *apreciación fáctica inverosímil*, resultado del testimonio no creíble del demandante Andrés Aponte Rivera, quien desde el inicio del trámite judicial incurrió en *inexplicables evasivas, múltiples contradicciones y serias mentiras. Segundo*, es un *dato no contradicho* —reconocido incluso por el tribunal sentenciador y este Foro— que la batería Sears, Diehard (modelo 4301), *fue bien construida* y *"no tenía defectos de manufactura que motivaran la explosión"*. (Énfasis suplido.) Sentencia parcial de 1ro de julio de 1992, pág. 3. *Tercero*, fue *instalada* correctamente el 17 de agosto de 1985 por Sears Roebuck de Puerto Rico (en adelante Sears) en el vehículo de Aponte Rivera, después de revisarse y verificarse que los componentes del sistema eléctrico (regulador de voltaje, alternador, arranque del motor (*starter*), cables de la batería y correa del alternador) funcionaban adecuadamente. *Durante casi tres (3) años* —hasta que sucedió la explosión debido a la negligencia de su dueño Aponte Rivera— *funcionó en perfectas condiciones. Cuarto*, el accidente *ocurrió exclusivamente por la negligencia crasa de Aponte Rivera*, quien conocía por experiencia el carácter inherentemente peligroso ex-

plosivo de la batería y, contra las advertencias e instrucciones expresas en el idioma inglés (*que conocía*), intervino con ella indebida y negligentemente. *Quinto*, las advertencias principales en el idioma inglés destacadas *prominentemente* en la batería fueron más que suficientes, por tratarse de palabras familiares y en uso por décadas en la economía y el entorno puertorriqueño, tales como *"Danger-Explosive; Acid-Poison; Caution"*. *Sexto*, el Tribunal impone "responsabilidad absoluta" a Sears al concluir que se "requiere que las advertencias e instrucciones provistas por el fabricante de un producto trasciendan las barreras de lenguaje" (Opinión del Tribunal, pág. 842) y confirma implícitamente el criterio del tribunal de instancia de que aplica la Ley Núm. 233 de 23 de julio de 1974, conocida como Ley de Sustancias Peligrosas de Puerto Rico, 24 L.P.R.A. sec. 2701 *et seq*. *Séptimo*, jamás ningún estudio realizado ha impuesto obligación de advertir *específicamente* sobre el posible "peligro de mover los conectores de los polos de la batería, justo antes de intentar encender el vehículo". Tampoco en cuanto a la distancia prudente a mantenerse. Opinión del Tribunal, pág. 846. Y *octavo*, al presente existen en el mercado y las tiendas del país, *y además en las carreteras, en uso vehicular, cientos de miles* de baterías que sólo contienen en el idioma inglés las advertencias precautorias similares a las del caso de autos, según requeridas por la industria manufacturera. *Como imperativo de la decisión de hoy, todas estas baterías, de un plumazo judicial, son defectuosas y sus fabricantes responsables de manera absoluta por cualquier explosión que ocurra debido al mal uso de su dueño.*

## II

*Alegaciones; falsedades y verdades*

En su demanda *original*, como *única* causa de acción, Aponte Rivera alegó que sus daños fueron causados por *"un defecto en la manufactura de la batería"*. Especificó que

explotó por Sears "distribuir y poner en el mercado *una batería defectuosa y en condiciones que la hicieron estallar en el momento del accidente sin* que mediara ningún tipo de intervención negligente [de su] parte", y que la batería fue *"construida negligentemente"*. (Énfasis suplido.) Demanda, pág. 2. Sears contestó, negando toda responsabilidad, y adujo que Aponte Rivera fue negligente.

Subsiguientemente, como parte del descubrimiento de prueba, Sears le tomó a Aponte Rivera una deposición. En ésta declaró enfáticamente que antes del accidente levantó el bonete y pidió a su esposa que pasara al lado del conductor para intentar "prender" el carro; que se puso a "chequear" el motor "solamente mirándolo"; que se situó frente al carro, "al lado contrario de la batería"; que no metió la cara dentro del bonete; que *"no tocó nada allí"*. Declaró:

> P. Le pregunto si en esa inspección visual se detuvo usted a mirar si había algo con la batería.
> R. Sí, yo chequié [sic], *miré* la batería también, *todo estaba en orden.*
> P. *¿Tenía las tapas puestas?*
> R. *Tenía tapas puestas y todo.*
> P. ¿No vio ningún cable suelto?
> R. Ningún cable de ninguno.
> P. ¿Usted no meneó los cables de donde está el polo de la batería, ni nada de eso?
> R. *No, señor.*
> P. *¿No hizo nada de eso,* don Andrés?
> R. *No, señor.* (Énfasis suplido.) Deposición del Sr. Andrés Aponte, pág. 74.

*Demás está decir que estas contestaciones (no tocó ni hizo nada y visualmente todo estaba normal) "coinciden" perfectamente con sus alegaciones en la demanda original de que la batería explotó por estar defectuosamente construida.* Dos (2) meses después *enmendó* la demanda, esta vez para alegar que la batería era un "producto inherentemente peligroso", pues los avisos de peligro que tenía escritos estaban "en un idioma extranjero" y eran insuficientes e inefectivos, lo cual "constitu[ía] en sí mismo un defecto del producto".

En abierta contradicción a sus alegaciones originales y

*versión bajo juramento*, la prueba demostró que Aponte Rivera intervino y movió los cables que conectan los polos de la batería. *Conociendo por experiencia la peligrosidad inherente explosiva de la batería, imprudentemente le quitó las tapas para verificar el contenido del líquido ácido y no las volvió a colocar.* Como consecuencia, al instruir a su esposa de que encendiera el auto, la emanación de los gases causó la explosión.([1])

*Ante estas realidades, es totalmente injusta la errada opinión mayoritaria que impone a Sears responsabilidad absoluta por una supuesta falta de especificidad en las advertencias; más aún es jurídicamente errónea la conclusión de que la omisión de una advertencia específica fue la "causa adecuada" de la explosión.* Profundicemos.

En su deposición, Aponte Rivera *admitió* que sabía del "peligro que acarreaba [su] actuación el día del accidente". Sabiéndolo, se descuidó y no se protegió ni tomó las mismas precauciones que adoptó para con su hijo, las cuales lo salvaron de sufrir daños, todo porque en ese momento "no cre[y]ó [ni] pensó en eso, que la batería fuera a botar chispa". Apéndice, pág. 251. La causa adecuada de la explosión *no* fue la falta de instrucciones en español o la supuesta carencia de una especificidad sobre el mal uso de las tapas y de tal peligro. Repetimos, *Aponte Rivera conocía todas esas circunstancias.* Ante estas admisiones y la prueba tan contundente, cómo puede la mayoría afirmar que "no se presentó evidencia de que el demandante cono-

---

([1]) El perito de Sears Roebuck de Puerto Rico (en adelante Sears) —John Devitt— a quien el tribunal de instancia *le dio total y entero crédito*, expuso, como *otra posible explicación*, que las tapas en evidencia mostraban un *daño previo, no producido por la explosión* y que el gas escapó por éstas. En particular, atestó que el arrestor de llama *(flame arrestor)* —sistema de seguridad que permite que la batería libere la presión de los gases que produce sin permitir la entrada de ninguna fuente de ignición— estaba deformado por el calor y, por lo tanto, no funcionó de forma adecuada. *Esa deformación no era de fábrica, sino que provino de alguien, durante su uso, como haberla puesto sobre una superficie extremadamente caliente.*

*Reiteró que la batería había sido bien construida y que el daño a las tapas no vino de su manufactura, sino que fue causado en algún momento durante los tres (3) años anteriores en que Aponte Rivera la tuvo y usó.*

Obviamente, según esta explicación alterna, tampoco habría ninguna responsabilidad de Sears.

ciera o debiera conocer de los riesgos específicos asociados al manejo de la batería". Opinión del Tribunal, pág. 846.

Con todo respeto, incide la mayoría en una *arbitrariedad* al concluir que la ausencia de una advertencia específica fue la causa adecuada de la explosión. Por el contrario, las admisiones de Aponte Rivera demuestran que tenía conocimiento sobre los peligros resultantes del manejo de una batería, en particular que la manipulación de los cables y terminales provoca chispas, y que éstas, al entrar en contacto con gases en el ambiente pueden causar una explosión. Sabía o debía saber que la batería produce gases explosivos. *Además, entendía satisfactoriamente el idioma inglés por razón de su educación, trabajo y experiencia.* Veamos.

Al ocurrir los hechos en 1988, Aponte Rivera tenía cuarenta y tres (43) años. Era graduado de Escuela Superior y fungía como Inspector de Salud Ambiental del Depantamento de Salud, donde empezó a trabajar en 1966. Como tal, participó en un programa para el exterminio del mosquito *Aedes Aegypti*, regando el insecticida conocido como *Malathion*, veneno poderosísimo capaz de matar seres humanos. Aponte Rivera admitió que conocía la peligrosidad de dicho producto, tanto en su forma líquida como en gases. Recibió un entrenamiento específico para desempeñarse en salud ambiental que, por voz propia, incluía todo lo que afectara la salud en general y el ambiente, incluso la contaminación por químicos. Como inspector de salud ambiental efectuaba inspecciones en todas las instalaciones o facilidades que afectan la salud pública, tales como fábricas, alimentos, restaurantes, residencias o solares. Apéndice, págs. 84, 139, 212–219 y 130.

Se *especializó* en la inspección de fábricas y almacenes de alimentos. Durante diecinueve (19) años inspeccionó distintas industrias y plantas de producción de alimentos. Por siete (7) años hizo lo propio en la *National Packaging*, en Ponce, acompañado del Jefe de la planta, quien era norteamericano. Apéndice, págs. 132 y 203–207.

*Aceptó* que conocía la *peligrosidad* de la batería en función del uso que podía darle. Sabía específicamente que *la manipulación de los cables en sus polos provoca que boten chispas*; los había visto botar chispas en otras circunstancias. Conocía, por experiencia propia, que cuando se "jumpean" los carros se colocan cables en los polos y *botan chispas.* Indicó, *precisamente, que cuando las baterías hacen chispas esto hace pensar que la batería es, en efecto, peligrosa.* Apéndice, págs. 206–209. También, *por su experiencia, conocía que las chispas podían incendiar los gases* de la gasolina en un automóvil y ésta era *otra razón adicional para pensar que las baterías en un automóvil pueden ser peligrosas cuando se manipulan.* Apéndice, pág. 211.

Su experiencia de más de veinte (20) años como conductor, dueño y usuario de un automóvil es la razón por la cual aprendió los detalles sobre la peligrosidad de una batería, según antes descritos. Apéndice, pág. 226.

*Después de todas estas admisiones*, para avalar su enmienda a la demanda, Aponte Rivera alegó no tener conocimiento del idioma inglés. *No es creíble.* Contrario a ello *admitió conocer el significado de la palabra "explosive"* desde hacía años; también lo que quería decir *voltage regulator, alternator, starter* y *battery cables.* Apéndice, págs. 243–245. *Sabía que algo "explosivo" es peligroso y hay que tener mucho cuidado.* Apéndice, págs. 230 y 232–233.

Increíblemente dijo que *no había visto* la palabra "DANGER" prominentemente impresa en las tapas de la batería. Declaró que esa palabra en la batería no le llamó la atención en lo absoluto. Apéndice, pág. 231. En la parte superior de la batería (en las tapas) también están impresas dichas palabras, DANGER y EXPLOSIVE como parte de las advertencias ofrecidas por el manufacturero. Además, esa información está contenida en la literatura que le fue provista por Sears con la venta.

El documento de garantía de la batería que se le entregó contiene las advertencias siguientes:

### WARNING

Keep out of reach of children! Always shield eyes when working near batteries. Know and follow safe handling procedures or obtain professional help.

### POISON

CAUSES SEVERE BURNS. Contains sulfuric acid. Avoid contact with skin, eyes or clothing.
ANTIDOTE: EXTERNAL —Flush immediately with water.
EYES —Flush with water for 15 minutes and get prompt medical attention.
INTERNAL —Drink large amounts of water or milk. Follow with egg or vegetable oil. Call physician immediately.

### DANGER

EXPLOSIVE—CAN CAUSE BLINDNESS OR OTHER SEVERE INJURY. Batteries produce explosive gases. Keep sparks, flame, cigarettes away. Ventilate when charging or using in enclosed space. Always shield eyes when working near batteries. Apéndice, págs. 28–29.

Aponte Rivera *no* leyó los documentos suministrados por Sears *con estas advertencias*. Apéndice, pág. 233. A pesar de que sus hijos y su esposa entienden el idioma inglés, *no les pidió que le explicaran su contenido*. Tampoco le prestó atención a lo allí expresado, *ni siquiera intentó leerlo, no obstante contener en letras más grandes la palabra* EXPLOSIVE. Apéndice, págs. 111; 233–234 y 241–242.

Es *increíble* que con cuarto año de escuela superior, licencia de conducir por más de veinte (20) años, entrenamiento por seis (6) meses sobre el uso y manejo del poderoso veneno *Malathion,* más de seis (6) años manejando dicho veneno, y sobre diez (10) años de experiencia como inspector de salud, pretenda que le creamos que desconocía lo que la palabra *danger* quiere decir. Menos credibilidad merece que siendo conductor y habiendo residido siempre aquí, nunca haya visto esa palabra en letreros en la carretera u otros sitios (Apéndice, págs. 230–231); finalmente, es "curioso" que tal terminología en la batería no le llamara la atención.

Sin embargo, Aponte Rivera admitió saber lo que significaba *explosive*. Las palabras "gases" y "produce" son lo

mismo en inglés que en español; además, aceptó saber que *battery* es *batería*. La batería Sears advertía:

"*DANGER—EXPLOSIVE*

CAN CAUSE BLINDNESS OR SEVERE INJURY. PRO-TECT EYES. SPARKS, FLAMES, CIGARETTE CAN CAUSE EXPLOSION: TOOLS AND CABLE CLAMPS CAN CAUSE *SPARKS. DO NOT USE WITHOUT INSTRUCTIONS. KEEP VENT CAPS TIGHT AND LEVEL.*

*ACID—POISON*

CAUSES SEVERE BURNS. CONTAINS SULFURIC ACID. IN EVENT OF CONTACT FLUSH WITH WATER AND SEE A DOCTOR. KEEP OUT OF REACH OF CHILDREN." (Énfasis suplido.) Sentencia parcial, pág. 2.

Las palabras "DANGER—EXPLOSIVE" y "ACID—POISON" estaban escritas en letras anchas, muy visibles y más grandes que las demás palabras, midiendo éstas alrededor de 1/4 de pulgada. Estas advertencias cubrían todo el espacio contenido en cada una de las tapas; no sobraba espacio en la parte superior de la batería para incluir advertencias adicionales.

*Al requerirle a Sears una advertencia distinta (más específica) sobre el manejo de las tapas y los polos, se abroga este Tribunal una función que pertenece a los expertos de la industria; se trata de una exigencia que ni siquiera existe a nivel nacional federal.*

Lo que nos recuerda que la "indicación de cada advertencia adicional diluye el impacto de cada otra advertencia. Dado al corto margen de atención, cada advertencia excluye una de la otra; se pierden en las letras pequeñas (*fine print*). Si cada riesgo previsible debe incluirse, la lista final sería tan extensa que llenaría un volumen". (Traducción nuestra.) *Cotton v. Buckeye Gas Products Co.*, 840 F.2d 935 (Cir. D.C. 1988).

*El mismo Exhibit 8(D)de Aponte Rivera, unido al final de esta disidencia, ilustra dramática y satisfactoriamente estas advertencias, su conspicuidad y pone de manifiesto su falta de credibilidad.*

La suficiencia y adecuacidad de estas advertencias es evidente. *La propia opinión mayoritaria así lo reconoce,* al afirmar que en la batería se "advertían en términos generales del peligro inherente del producto; ofrecían instrucciones sobre el procedimiento para cargar la batería; aconsejaban al usuario leer el manual de instrucciones o buscar ayuda técnica en relación con cómo cargarla en determinadas circunstancias; instruían sobre mantener las tapas de la batería selladas, y ofrecían instrucciones sobre el tratamiento de primeros auxilios en caso de una lesión". Opinión del Tribunal, pág. 846. *No cabe duda alguna que dichas advertencias cumplían con las directrices provistas por la Ley federal de Sustancias Peligrosas (Federal Hazardous Substances Act, 15 U.S.C. sec. 1261 et seq.), la cual impone la obligación de colocar avisos e instrucciones sobre los peligros y el manejo de productos que contienen sustancias peligrosas.*

## III

Aparte de lo expuesto, notamos que la ilustrada sala de instancia *impuso una responsabilidad absoluta* a Sears al concluir que en virtud de "la Ley de Sustancias Peligrosas [de Puerto Rico], Núm. 233, (24 L.P.R.A. sec. 2701, *et seq.*) las advertencias sobre el manejo de la batería tenía que estar 'escrita en español en tipo conspicuo, prominente, legible y que contraste por su diseño, colocación o color con el resto del material impreso en la etiqueta' ".

Se trata de una lectura fragmentada y equivocada del artículo transcrito, que agrava a posteriori —injusta e irrazonablemente— la obligación estatutaria del demandado Sears de brindar unas advertencias. El efecto práctico de esa decisión es imponerle, *sin excepciones,* responsabilidad a Sears y a todo otro fabricante, mediante unos requisitos adicionales vía jurisprudencia no dispuestos por la Asamblea Legislativa. Elaboremos.

Es un error sostener que la Ley de Sustancias Peligrosas de Puerto Rico requiere que "cualquier información"

esté en *español*. El único mandato legislativo sobre el idioma es de carácter limitado, específicamente con referencia. a *cualquier información* contenida en la etiqueta sobre "[i]nstrucciones para el *manejo y almacenamiento de aquellos paquetes que requieren cuidado especial en relación con su manejo y almacenamiento*".([2]) (Énfasis suplido.) 24 L.P.R.A. sec. 2702(o)(1)(I). En este caso, la batería de Sears no estaba en su paquete original, tampoco almacenada, y menos en "manejo" traslado; *sino instalada y en funcionamiento casi tres (3) años antes.*

En el contexto de este caso, fue un error de instancia conceptualizar y equiparar la palabra "manejo" con toda acción, intervención o manipulación de una batería, sobre todo *cuando ya está instalada en un vehículo.* Al examinar integralmente el texto del subpárrafo 1 de la citada Ley Núm. 233 (24 L.P.R.A. sec. 2702(o)(1)(I)), *único* que manda que la información esté en español—notamos las palabras "manejo y almacenamiento" unidas por la conjunción *"y"*. Al explorar el resto del texto, vemos que habla de *"paquetes* que requieran cuidado especial". (Énfasis suplido.) Íd. Es claro que el contexto en que nos ubica dicha disposición es el *de un producto empaquetado*; condición que dista mucho de ser una batería instalada. Corrobora esta interpretación la definición de *envase inmediato* de la referida Ley Núm. 233 cuyo "término no incluye los forros exteriores de los *paquetes*". Aquí, "manejo" lógicamente se refiere al traslado o movimiento de paquetes especiales que regularmente se hace, sea desde el embarque donde esté la mercancía hasta su almacén, o desde éste hasta la tienda.

Si examinamos el estatuto federal sobre la misma materia —*Hazardous Substances Act*, supra— cuyas disposiciones *Sears cumplió*, notamos que en 15 U.S.C. sec. 1261(p)(1)(I) se dispone: "(I) instructions for handling and storage of packages which require special care in handling or storage." Inmediatamente, el subpárrafo 2, expone: "on

---

([2]) La versión en el idioma inglés dispone: "(i) instructions for the *handling and warehousing of those packages requiring special care*." (Énfasis suplido.)

which any statements required under subparagraph (1) of this paragraph are located prominently and are in the English language in conspicuous and legible type in contrast by typography, layout, or color with other printed matter on the label." (Énfasis suplido.) 15 U.S.C. sec. 1261(p)(2).

Mientras nuestra Ley Núm. 233, *supra, únicamente* exige en español lo contenido en la letra (I) del subpárrafo 1, esto es, lo pertinente al "manejo y almacenamiento de paquetes" especiales; en contraste, la federal requiere en el idioma inglés *todo* lo consignado en el subpárrafo 1, cuyo contenido es *idéntico* a nuestro subpárrafo 1, y entre cuyos incisos está el (I).

Esta diferencia es susceptible de dos (2) interpretaciones. *Primero*, con vista a que ambos estatutos son virtualmente idénticos, concluir que al redactarse nuestra Ley Núm. 233, *supra*, el Legislador *cometió un error tipográfico* y su intención fue que toda instrucción o advertencia en la etiqueta fuera en español. Tendería a avalar este enfoque, que ni en su historial como tampoco en su exposición de motivos surgen razones de que nuestra Asamblea Legislativa empleó una valoración distinta del modelo federal, requiriendo sólo que apareciera en español la información pertinente a "manejo y almacenamiento de paquetes" especiales. Al amparo de esta conclusión, en justicia *no* podríamos imponer *responsabilidad absoluta* a Sears por incluir en el idioma inglés la información, pues estaríamos penalizándola por un error de la Asamblea Legislativa del cual no tuvo culpa alguna. Cualquier pronunciamiento nuestro en este sentido tendría, por imperativo, que ser *prospectivo*.

Y la segunda, resolver que no hubo el aludido error tipográfico y que la Asamblea Legislativa quiso que únicamente se expresara en español la información e instrucción sobre "manejo y almacenamiento de paquetes" especiales. En esta alternativa, no cabría hablar de responsabilidad absoluta de Sears, pues el accidente *no ocurrió durante ese proceso*, sino ya *instalada*. No podemos olvidar que en casos de responsabilidad absoluta fundada en instrucciones y

advertencias defectuosas hay que analizar, entre otros factores, *si ese defecto en las advertencias fue la causa adecuada de los daños.* Aquí no fue así. El accidente no ocurrió durante el "manejo y almacenamiento de un paquete", sino en un acto de intervención u operación de una batería instalada para lo cual nuestra ley *no* requiere instrucciones en español.

Bajo estas dos (2) posibles interpretaciones, sinceramente no vemos cómo el tribunal de instancia pudo concluir que las instrucciones eran defectuosas. Es injusto ignorar que Sears cumplió con la Ley Núm. 233, *supra.* El cuadro comparativo que vía apéndice unimos a este disenso ilustra esta afirmación. Dicha ley *detalla* la información que debe contener la batería y especifica la instrucción que ha de estar en español. *En recta hermenéutica, si la Ley Núm. 233, supra, se encarga de particularizar qué debe estar en español, obviamente el resto puede estar en el idioma inglés.* No podría ahora este Tribunal permitir al Estado ir contra sus propios actos, invocando casos y escritos jurídicos (Opinión del Tribunal, pág. 842 esc. 11) que propugnan que el fabricante haga un estudio de las características poblacionales para saber si debe incluir información en español. Buena o mala en su redacción, la Asamblea Legislativa estableció el contenido de la información que debía incluirse en la etiqueta, así como el idioma que habría de redactarse.

*Precisamente, la falta de uniformidad y de control sobre la rotulación inspiró la Ley Núm. 233, supra.* Además, confirió al Secretario de Salud el poder para, entre otras cosas, reglamentar la rotulación. *En nuestra búsqueda investigativa no hemos encontrado reglamento alguno de dicho funcionario.*

No sería justo, pues, considerar los requisitos de la Ley Núm. 233, *supra*, como mínimos y, no obstante haberlos cumplido el fabricante Sears, imponerle a posteriori responsabilidad por no advertir sobre algún aspecto que, aunque no previsto por el Legislador ni los expertos en la industria, *luego* un tribunal consideró necesario.

## IV

*Predominio del idioma español*

Nuestros pronunciamientos sobre la ausencia de responsabilidad de Sears en las circunstancias específicas del caso no deben entenderse como ajenos a la situación lingüística en el país. *Es innegable el arraigo del idioma español y su predominio en la comunicación e interacción diaria ciudadana.* Por herencia paterna judicial sabemos que "[e]s un hecho no sujeto a rectificaciones históricas que el vehículo de expresión, el idioma del pueblo puertorriqueño —parte integral de nuestro origen y nuestra cultura hispánica— ha sido y sigue siendo el idioma español". *Pueblo v. Tribunal Superior*, 92 D.P.R. 596, 604 (1965).

Aún así, más allá del uso del español en los procesos judiciales, distintos esquemas legislativos en diferentes momentos y ámbitos —desde el aparato gubernamental hasta las relaciones comerciales— con mayor o menor énfasis han buscado la coexistencia del idioma español e inglés. En lo concerniente a productos o artículos en el comercio, en cada pieza de ley, la Asamblea Legislativa ha efectuado un particular balance en virtud de los propósitos que la animan y ha conferido determinado peso a uno u otro lenguaje en sus distintos aspectos. No hay un *criterio uniforme legislativo* que nos permita señalar a priori qué aspectos en rótulos, etiquetas o instrucciones deben aparecer en español o inglés. Afloran distintas directrices.(³)

---

(³) La Ley de Alimentos Comerciales para Animales Domésticos de Puerto Rico, Ley Núm. 110 de 28 de junio de 1962 (5 L.P.R.A. sec. 554 *et seq.*), dispone, en lo pertinente, en su Art. 4 que *todo alimento comercial a ser distribuido en Puerto Rico tendrá un marbete o rótulo que contenga la información "impresa en español o en inglés; Disponiéndose, que la información requerida ... deberá aparecer siempre en español, y optativamente, también en inglés o en cualquier otro idioma que desee el fabricante. La información requerida [en el apartado (4)] deberá aparecer también en español"*. (Énfasis suplido.) 5 L.P.R.A. sec. 557.

Y, finalmente, la Ley de Plaguicidas de Puerto Rico, Ley Núm. 49 de 10 de junio de 1952 (5 L.P.R.A. sec. 1001 *et seq.*), luego de esbozar en su artículo 2 un catálogo de supuestos para considerar "falsamente rotulado" un plaguicida, confiere al Secretario de Agricultura, entre otros, el poder de *"exigir el uso de los idiomas español e inglés, en los marbetes y en la rotulación de los plaguicidas y dispositivos"*. (Énfasis suplido.) 5 L.P.R.A. sec. 1005(c).

Aunque favorecemos criterios uniformes en el idioma español, compete a la Asamblea Legislativa y al Secretario de Salud, no a este Tribunal, efectuar la valoración pertinente, plasmarla en un estatuto o reglamento y delinear lo que son advertencias e instrucciones suficientes.

## V

*Ausencia de nexo causal entre el resultado dañoso y el deber de advertir*

El Art. 1802 del Código Civil, 31 L.P.R.A. sec. 5141, exige en toda acción, bajo negligencia o de responsabilidad absoluta, establecer el nexo causal entre el daño sufrido y la conducta u omisión imputada al demandado. *Rivera et al. v. Superior Pkg., Inc. et al.*, 132 D.P.R. 115 (1992); *Soc. Gananciales v. G. Padín Co., Inc.*, 117 D.P.R. 94, 106 (1986); *Mendoza v. Cervecería Corona, Inc.*, 97 D.P.R. 499, 512 (1969). En una reclamación contra el fabricante por falta de advertencia sobre los peligros de un producto, *es imperativo establecer el nexo causal* entre el incidente que da lugar a los daños y la ausencia de esa advertencia. *Rivera et al. v. Superior Pkg., Inc. et al.*, supra. O sea, es menester establecer la relación *entre la ausencia de advertencia —o su inadecuacidad— y el daño.*

*La mayoría descarta este principio al concluir que "resulta inmaterial" que Aponte Rivera no leyera las instrucciones.* Opinión del Tribunal, pág. 846. Seguidamente afirman que "[c]uando se incumple con el deber de informar adecuadamente, que el demandante no lea las advertencias o instrucciones no debe ser óbice para descartar la reclamación por daños". Íd. *Este obrar judicial mayoritario transforma la responsabilidad absoluta en "responsabilidad diabólica". Trastoca el requisito de causa adecuada y, con ello, todo nuestro esquema de responsabilidad civil extracontractual.*

En el contexto del caso de autos, *advertir es avisar de un peligro del cual no se tiene conocimiento para habilitar a la*

*persona a adoptar las medidas necesarias para protegerse.* Si el peligro es obvio y generalmente conocido, nada se gana con la advertencia y ninguna es requerida. En recta lógica, la falta de advertencias o su inadecuacidad se torna fútil e inmaterial si el perjudicado conoce la peligrosidad del objeto y, como aquí, asume negligentemente el riesgo; *en esa situación no se configura el nexo causal entre el daño sufrido y el deber de advertir.*

*Aparte de la batería, sabido es que un vehículo de motor contiene innumerables piezas inherentemente peligrosas y, además, que su funcionamiento necesita de varios líquidos caracterizables como inflamables o dañinos a la salud.* Un automóvil siempre exige gasolina o *diesel* en su tanque, combustibles volátiles capaces de producir una explosión por descuido o mal uso. El sistema de enfriamiento requiere un radiador lleno de agua o del líquido *coolant* que alcanza altas temperaturas. Abrir dicho radiador conlleva adoptar medidas precautorias especiales para evitar que el agua en ebullición o en forma de vapor cause quemaduras. Además, las superficies de los motores, radiadores y demás piezas generan calor suficiente como para causar graves quemaduras si hay contacto con la piel humana. Los motores utilizan abanicos y múltiples correas que requieren precauciones especiales. *Todas estas circunstancias, de ordinario, son de conocimiento común. Y, claro está —con o sin advertencias en inglés o español— la mala utilización por el dueño o conductor de un vehículo no genera responsabilidad del fabricante del automóvil, del líquido o de la pieza.*

## VI

### Conclusiones

En este caso, *no existe controversia alguna de que la batería fue bien construida, instalada y no estaba defectuosa. Únicamente la negligencia del demandante Aponte Rivera generó sus daños. Asumió voluntariamente*

*un riesgo conocido.* No hay responsabilidad absoluta del fabricante Sears por falta o inadecuacidad de advertencias, *pues incluyó la información requerida tanto por la ley federal como la referida Ley Núm. 233.* Nuestro estatuto no le vedaba hacerlo en inglés, pues éste particulariza y limita la información que debe aparecer en español (sólo referente a "manejo y almacenamiento de paquetes" especiales).

*Independientemente de si procedía o no una instrucción en español, contrario a la lógica mayoritaria, la causa adecuada de los daños no fue esa omisión en las advertencias o su inadecuacidad, sino la actuación negligente del demandante Aponte Rivera. Conocía el idioma inglés de manera suficiente. Su versión de los hechos no es creíble.*

Preocupa la interpretación mayoritaria forzada que trasciende este inaudito caso. Su decisión de imponer *responsabilidad absoluta* a Sears se extiende potencialmente sobre más de millón y medio (1,500,000) de automóviles[4] que transitan por las vías públicas y, además, numerosas embarcaciones,[5] las cuales utilizan baterías.

El dictamen mayoritario significa que si cualesquiera de las cientos de miles baterías *bien construidas e instaladas* en esos automóviles y embarcaciones —que lleven impresas similares advertencias en inglés, "judicialmente hoy consideradas deficientes"— explotan luego de uno, dos, tres o cuatro (1, 2, 3 ó 4) años de uso, *habrá responsabilidad absoluta del fabricante.* Para quedar liberados de esa responsabilidad, Sears y los otros fabricantes de tales baterías tendrán que acudir prontamente a las tiendas donde el producto está distribuido, mejorar las instrucciones y advertencias sobre el manejo de las tapas y los polos e imprimirlas *todas en español.* Incluso tendrán que hacer la

---

[4] El Departamento de Transportación y Obras Públicas estima que en nuestras carreteras transitan aproximadamente un millón ochocientos ochenta y ocho mil (1,888,000) vehículos.

[5] Según cifras extraoficiales del Departamento de Recursos Naturales, hay aproximadamente veintitrés mil (23,000) embarcaciones activas, que se desglosan en cerca de diecinueve mil (19,000) de placer y cuatro mil (4,000) de pesca. Estas embarcaciones, junto a las inactivas, suman alrededor de treinta y cinco mil (35,000).

monumental tarea de un *llamado (recall)* para adherir esas instrucciones en español en los cientos de miles de vehículos y embarcaciones en uso.

"[E]s más fácil ser generoso que ser justo, pero nuestro sentido del deber nos impide tomar el camino más fácil si éste está reñido con la justicia." *Silva v. Comisión Industrial*, 91 D.P.R. 891, 904 (1965). Con todo respeto, la decisión mayoritaria al darle entero crédito a la versión del demandante Aponte Rivera e imponerle responsabilidad absoluta a Sears pasará a la historia como un gran acto de "ingenuidad judicial".

## APÉNDICE

## CUADRO COMPARATIVO

La Columna derecha contiene el texto fiel y exacto del Art. 2(o)(1)(a)-(i) de la Ley Núm. 233 de 23 de julio de 1974, en español e inglés, según aprobada por la Asamblea Legislativa, 1974 Leyes de Puerto Rico (Parte 2) 227, 231–232 y 1972 Laws of Puerto Rico (Part 2) 207, 211–212, respectivamente.

| *Requisitos* de la Etiqueta según la sec. 2(o)(1) de la Ley Núm. 233 de 23 de julío de 1974 (24 L.P.R.A. sec. 2702(o)(1)). | *Requisitos* que tenía la Etiqueta Batería *Sears*. |
|---|---|
| "(a) El nombre y dirección del negocio del fabricante, envasador, distribuidor o vendedor;" <br><br> "(a) The trade name and business address of the manufacturer, packer, distributor or seller;" | "Sears Die Hard" <br> (Carecía de dirección) |
| "(b) El *nombre corriente* o el *nombre químico*, si no tuviere nombre corriente, el de la *sustancia peligrosa*, o el de cada uno de los componentes que contribuyan a su condición de peligrosa a menos que el Secretario, mediante reglamento, permita o requiera el uso de un nombre genérico reconocido;" <br><br> "(b) The *common* or *chemical* name; if it should not have a common name, the name of the dangerous substance, or the name of each and every one of the components which contribute to its dangerous condition, unless the Secretary, through regulation, permits or requires the use of the recognized generic name;" | "ACID" <br><br><br> "Sulfuric Acid" |
| "(c) La palabra 'Peligro' en *letras más prominentes* que el resto de la etiqueta en aquellas sustancias que son sumamente inflamables, *corrosivas* o sumamente tóxicas;" <br><br> "(c) The word 'Danger' in *letters more prominent* than those in the rest of the label in those substances that are highly inflamable, corrosive or highly toxic;" | "DANGER" |

| | |
|---|---|
| "(d) La palabra 'Advertencia' o 'Precaución' en letras más prominentes que el resto de la etiqueta *en todas las otras sustancias peligrosas*;"<br><br>"(d) The word 'Warning' or 'Precaution' in letters more prominent than those in the rest of the label *in all the other dangerous substances*;" | *Inaplicable*: sólo el ácido sulfúrico era la sustancia peligrosa. |
| "(e) Advertencias sobre el *peligro o de los peligros principales* como por ejemplo 'inflamable', 'combustible', 'vapor nocivo', 'causa quemaduras', 'absorbido a través de la piel' en letras más prominentes que el resto de la etiqueta;"<br><br>"(e) Warnings of the danger or the main dangers such as: 'inflammable', 'combustible', 'noxious vapor', 'causes burns', 'absorbed through the skin' in letters more prominent than those in the rest of the label;" | "Can Cause Blindness or Severe Injury; Sparks, flames, cigarette can cause explosion. Causes Severe Burns". |
| "(f) Medidas de precaución informando la acción a seguirse o evitarse excepto cuando por reglamento sean modificadas por el Secretario;"<br><br>"(f) Measures of precaution advising of the action to be followed or avoided, except when modified through regulation by the Secretary;" | "Tools and Cable clamps can cause *sparks. Do not use without instruction. Keep Vent caps tight and level.* Keep out of reach of children" |
| "(g) Instrucciones para tratamientos de primeros auxilios;"<br><br>"(g) First aid instructions;" | "In contact flush with water and see a Doctor" |

| | |
|---|---|
| "(h) La palabra 'Veneno' en letra más prominente que el resto de la etiqueta para cualquier sustancia sumamente tóxica; "(h) "The word 'Poison' in letters more prominent than those in the rest of the label for any substance which is highly toxic;" | "POISON" |
| "(i) *Instrucciones [en Español]* para el manejo y almacenamiento de aquellos *paquetes* que requieran *cuidado especial* en relación con su manejo y almace namiento;" "(i) Instructions [in spanish] for the handling and warehousing of those packages requiring special care;" (Énfasis suplido.) | *Inaplicable*: la batería estaba insta-lada y en funcionamiento por aproximadamente tres (3) años. (Énfasis suplido.) |