# United States Court of Appeals
## For the First Circuit

No. 04-1695

VIRGINIA PRADO ALVAREZ; MAYRA JANETTE GARCIA PRADO;
EDGARDO GARCIA PRADO; ORLANDO GARCIA PRADO;
IVELLISE GARCIA PRADO; FRANCISCO GARCIA PRADO;
JAVIER GARCIA PRADO; CARMEN ROSA ADORNO; JOHAM GARCIA ADORNO,

Plaintiffs, Appellants,

v.

R.J. REYNOLDS TOBACCO COMPANY, INC.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Jaime Pieras, Jr., Senior U.S. District Judge]

Before

Selya, Circuit Judge,
Coffin, Senior Circuit Judge,
and Lipez, Circuit Judge.

Herbert Muriel with whom Amarilys Arocho-Maldonado was on brief for appellants.
Robert H. Klonoff with whom Paul R. Reichert, Jones Day, Salvador Antonetti Zequeira, Luis A. Oliver, Rosalie Irizarry Silvestri, and Fiddler, Gonzalez & Rodriguez, P.S.C. were on brief for appellee.

April 21, 2005

**COFFIN, <u>Senior Circuit Judge</u>.**  Francisco García López began smoking in 1960, at age 25, and continued the habit for the next 42 years, ultimately smoking three packs of Winston cigarettes each day.  He died in October 2002, three months after being diagnosed with lung cancer.  His surviving family members brought this diversity action against the cigarette manufacturer, R.J. Reynolds Tobacco Co., claiming that smoking was a substantial factor in his illness and death.  Plaintiffs sought to recover damages based on a variety of tort and other Commonwealth law theories, including failure to warn and defective design.  The district court dismissed a failure to warn claim and granted summary judgment for defendant Reynolds on all other claims.  After careful scrutiny of the record, we affirm substantially for the reasons articulated by the court.

## I. Background

Decedent García had only a sixth grade education and could read little Spanish and no English.  Although he did not watch much television, several family members testified in depositions that he did regularly view the evening news.  His wife and at least four of his children also testified that, at various points during the years García smoked, they urged him to stop because of the health risks posed by cigarettes.  According to the undisputed facts the parties jointly submitted to the district court, García's wife and daughter had "years ago . . . talked about how the Decedent was

smoking too much." His wife acknowledged that, when she first saw him smoking, she warned him that it could be bad for his health.

The family reported one or two attempts by Garcia to stop smoking by using nicotine gum as a substitute. His son, Javier García Prado, testified that he gave his father one pack of the gum, and that the attempt lasted about two days and resulted in reduced smoking during that time. A daughter, Ivellise García Prado, said she bought him both nicotine gum and patches once he had developed a cough and was feeling ill; she said he used the gum and it reduced his smoking "a little," but he refused to use the patches. Another daughter, Mayra Janette García Prado, testified that her father stopped using the gum given to him by her sister because "there were no results." Decedent's grandson, Joham García Adorno, who lived with his grandparents, testified that his grandfather used the patches once and that he stopped smoking, but he did not remember for how long.

Another son, Edgardo García Prado, also noted his father's use of the nicotine gum, but said that he never completely stopped smoking. Edgardo testified that he "would tell [his father] to stop smoking every day and he would pay no attention." Still another son, Orlando, testified that, when family members or friends would tell his father that smoking was harmful, he would say "that we all have to die some time from something . . . . He always had the same answer." Decedent's brother, Demetrio García

Lopez, testified that he had been telling his brother that smoking was harmful since about 1970. Demetrio said he did not know his brother's perception of the health risks of smoking, noting, "[t]he thing is that he would not pay any attention to anybody, so it just didn't matter to him."

García's wife, Virginia Prado Alvarez, testified that, in May 2002, her husband stopped smoking because the price of cigarettes increased,[1] and he could no longer afford to buy them. He became bedridden, and, according to his wife, "[h]e was feeling very sick because he wasn't smoking." He was experiencing both abdominal pain and a dry cough, and medical tests ultimately revealed a right upper lung mass that was diagnosed as inoperable cancer. He deteriorated rapidly and died in October 2002 at the age of 68.

Appellants filed suit in June 2003, claiming that García's illness and death were caused by his smoking Winston cigarettes, which are manufactured by appellee R.J. Reynolds. They alleged negligence and strict liability claims under Puerto Rico law for failure to warn and design defect, claims for fraudulent misrepresentation and concealment, and a claim for violation of Article 189 of the Puerto Rico Penal Code, 33 P.R. Laws Ann. § 4307, which prohibits "[f]raud in [the] delivery of [a] thing."

---

[1] A daughter also testified that he stopped smoking because of a price increase in May 2002.

The district court dismissed the post-1969 failure-to-warn claims based on preemption by the Federal Cigarette Labeling and Advertising Act, 15 U.S.C. §§ 1331-1341, and it subsequently granted summary judgment on the remaining claims. The court concluded that plaintiffs had failed to establish that ordinary consumers were unaware of the health risks of cigarette smoking during the relevant time period, undermining both the design defect and the pre-1969 failure-to-warn claims. The court further ruled that plaintiffs failed to adduce evidence of a design defect or to offer evidence that the decedent's injuries were proximately caused by Reynolds' failure to warn. The court rejected the fraud claims, inter alia, for lack of evidence of false statements heard or reasonably relied on by decedent, and it concluded that the Article 189 claim suffered from dispositive deficiencies.

On appeal, appellants challenge each of the district court's summary judgment rulings.[2]

## II. Discussion

We review the district court's grant of summary judgment de novo. Cruz Vargas v. R.J. Reynolds Tobacco Co., 348 F.3d 271, 280 (1st Cir. 2003). Although we draw all reasonable inferences in favor of the nonmoving party, id., that party must respond to a

---

[2] At oral argument, appellants' attorney stated that they no longer were pursuing their negligence claims; the failure-to-warn and design defect claims thus remain only as strict liability causes of action.

properly supported motion with sufficient evidence to allow a reasonable jury to find in its favor "with respect to each issue on which [it] has the burden of proof," DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir. 1997). See also Rochester Ford Sales,Inc. v. Ford Motor Co., 287 F.2d 32, 38 (1st Cir. 2002). With that standard in mind, we turn to our examination of appellants' claims.

A. The Role of Common Knowledge

As the district court observed, appellants may not prevail on either the common law failure to warn or the design defect claims unless they can show that the ordinary consumer was unaware of the dangers of smoking. See Cruz Vargas, 348 F.3d at 275 ("[A] manufacturer cannot be held liable under either strict liability or negligence for failure to warn of a danger commonly known to the public."); Aponte Rivera v. Sears Roebuck, 44 P.R. Offic. Trans. 1, 7, 144 D.P.R. 830 (1998) ("[A] manufacturer need not warn of a hazard if the average consumer ordinarily has knowledge of the dangers of the product."); Aponte Rivera, 44 P.R. Offic. Trans. at 6, 144 D.P.R. 830 (citing § 402A of the Restatement (Second) of Torts, comment i, which states that a product is defective only if it is "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics").

Both parties sought to establish their position on common knowledge through expert evidence, but Reynolds filed a motion to exclude the testimony of plaintiffs' proposed expert, Marly Ferrer Montalvo, claiming inter alia, that she lacked the requisite education and experience to qualify as an expert. Although the district court did not explicitly rule on this motion, it did not refer to Ferrer's report in its summary judgment decision, relying entirely on the common knowledge conclusions of Reynolds' expert, Luis Martínez-Fernández. The court's silence seems to us to imply rejection of plaintiffs' expert evidence, a ruling that would be subject to review only for abuse of discretion. See Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 152 (1999); Gen. Elec. Co. v. Joiner, 522 U.S. 136, 138-39 (1997); Currier v. United Techs. Corp., 393 F.3d 246, 251 (1st Cir. 2004). In any event, as we shall explain, even under de novo review we would conclude that Ferrer's presentation is inadequate, particularly in light of Martínez' detailed affidavit, to permit a jury to find for plaintiffs on the issue of common knowledge.

In Cruz Vargas, we observed that the "common knowledge" defense is assessed objectively and, "despite the nomenclature, it is a technical question involving methods, financing, and sources of research beyond the competence of lay determination, at least when pertaining to history forty or fifty years removed from the time of trial." 348 F.3d at 277. In performing its gatekeeping

function in assessing proffered expert evidence, a court must consider "whether the putative expert is 'qualified by "knowledge, skill, experience, training, or education."'" Ed Peters Jewelry Co. v. C & J Jewelry Co., 124 F.3d 252, 259 (1st Cir. 1997); see also Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 592 (1993) ("relaxation of the usual requirement of first-hand knowledge . . . is premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline"); Poulis-Minott v. Smith, 388 F.3d 354, 359-60 (1st Cir. 2004); Fed. R. Evid. 702. Ferrer's qualifications to serve as an expert were marginal, at best.

At the time of her report, Ferrer possessed only a bachelor's degree in history, and most of her research experience was irrelevant to the issue of common knowledge of the health risks of smoking. Her master's thesis (written but, at the time of her report, not yet presented) related to the history of the Republic of Haiti, and her most recent work was as an archivist on a collection of documents relating to public works in the Commonwealth. As a graduate student in 2001, she presented a paper on Haiti at a Puerto Rican Historians Congress. Other experiences included about two years teaching high school students Puerto Rican and Latin American history, researching the history of the paso fino horse in Puerto Rico, working as a cultural tour guide in Old San Juan, and assisting a university professor with

research on neo-colonial history, particularly in the Caribbean, but excluding Cuba and Puerto Rico. Toward the end of that year of research, she did her only directly relevant work: collecting materials about tobacco advertising in Puerto Rico. Her particular assignment was to focus on religious and gossip magazines; in her deposition, she described this work as photocopying information, without analysis.

In sum, to grant the status of expert to one at the outset of an academic career, with such a variegated and unfocused record of scholarly efforts and minimal attention to analysis, would threaten the effective functioning of the gatekeeper process. Expert witnesses are "permitted wide latitude to offer opinions," Daubert, 509 U.S. at 592, and "'[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it,'" id. at 595 (quoting Weinstein, "Rule 702 of the Federal Rules of Evidence is Sound; It Should Not Be Amended," 138 F.R.D. 631, 632 (1991)). That a testifying expert thus should have achieved a meaningful threshold of expertise seems beyond debate.

Reynolds' expert, Martínez, was considerably more qualified in every relevant respect. A history professor since 1983, he earned his doctoral degree from Duke University in 1990 and, at the time of his affidavit, was a professor of history and Puerto Rican and Hispanic Caribbean Studies at Rutgers University. Author of seven books and monographs and more than twenty articles and essays, he

also has given more than thirty lectures on Latin American historical topics at colleges and universities. Among other scholarly awards, he received in 2000 the Lydia Cabrera Award of the Conference on Latin American History. He has taught a variety of courses on Latin American, Caribbean and United States history, and the course subject matter has included "the role of tobacco in Caribbean and Latin American culture, economy and society." Martínez' extensive professional involvement included serving as chair of the Caribbean Studies Committee for the Conference on Latin American History.

The two experts' proposed evidence also differed markedly. In a seven-page report based on approximately 130 hours of work, Ferrer reported that she had reviewed the bulletin and magazine of the Puerto Rican Medical Association from 1930 through 1970, reports of the Department of Public Health and the Commissioner of Education, and a series of movies developed by the Department of Education to address various social problems in Puerto Rico. She stated that she investigated the newspaper El Mundo from the 1930s through 1985 and found "some coverage of the health problems caused by cigarette use," but her report gives no specific citations to articles other than to state that she had found "approximately 15 articles [in 1964] on different subjects relating to tobacco, some of which included health problems that may be caused by smoking cigarettes." She acknowledged that her research was not yet

complete, noting that she was still investigating several magazines, including Readers Digest, which she noted was published in Spanish beginning in December 1940.[3]

Based on the limited materials she reviewed, Ferrer nevertheless concluded that "the research on the effects of tobacco use and cigarette smoking was only beginning in the 1950s and 1960s," and she observed that pervasive cigarette advertising "rendered futile any educational attempt to minimize the use of cigarette products." She further observed that much of the information about smoking that was available to Puerto Ricans was translated from English, and noted that "many times the basic ideas and concepts are lost in translation."[4] She emphasized that this language difficulty was exacerbated by the high percentage of illiteracy among Puerto Rico's residents. She concluded that decedent could have had no knowledge of nicotine addiction or the health risks of smoking because of the ambiguous nature of the information available to him. These conclusions were framed

---

[3] On the second day of her deposition, about four months after she first was deposed, she reported that she had in the interim checked "some issues" of the newspapers El Imparcial and El Vocero and also had reviewed the catalog of the national archive movie section, where she uncovered one agricultural documentary about growing tobacco in Puerto Rico.

[4] During her deposition, she was unable to cite any specific instances of such confusion and, upon questioning by defense counsel, agreed that two apparently translated articles shown to her from El Mundo that had been published in 1954 and 1955 would have been understood as linking smoking and cancer.

generally, and none was supported by specific citations to sources.[5]

By contrast, Martínez reported in his 31-page affidavit a wide variety of materials that he had examined. Among other sources, he reviewed weekly magazines, island-wide daily newspapers, Puerto Rican and national health publications, Puerto Rican laws relating to tobacco, smoking, cigarettes and health instruction; education materials, including health education courses and school texts; religious and church publications; polling and survey data; "materials related to popular culture"; and various government documents. His conclusions were annotated with 112 footnotes identifying specific sources. In addition to written materials, he stated that he considered "the role of oral tradition, which is particularly strong in Puerto Rico."

Based on his research, Martínez opined "to a reasonable degree of historical certainty" that throughout the decedent's lifetime

---

[5] We note as well that Ferrer's report was not sworn, which diminishes its potency as probative evidence. See Carmona v. Toledo, 215 F.3d 124, 131 (1st Cir. 2000) ("Documents supporting or opposing summary judgment must be properly authenticated. . . . 'To be admissible at the summary judgment stage, "documents must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e)."'"); Young v. City of Providence, 301 F. Supp.2d 163, 177 (D.R.I. 2004), aff'd in part, rev'd in part and remanded by 2005 WL 826073 (1st Cir. Apr. 11, 2005)(declining to credit expert's report on the assumption that it was not affirmed under oath by means of "an affidavit or any other sworn testimony"). Our conclusion on common knowledge does not, however, depend on this flaw, and Ferrer in any event reviewed her research during a lengthy deposition.

the general public received an "abundance of information" on the health risks of smoking and the difficulty some smokers encounter in attempting to quit.  He thus concluded that there has been "widespread, pervasive common knowledge throughout the twentieth century that cigarette smoking can cause serious life-shortening diseases, such as lung cancer, emphysema, hypertension, and heart disease."  He further reported common knowledge that cigarette smoking "can be habit forming, addictive, and/or very difficult for some to quit."

More persuasive than these general, perhaps overbroad, conclusions were his more particular references to sources of public information in the critical decade of the 1950s, immediately before the decedent started smoking.  For example, his affidavit cited nine articles related to smoking and health that appeared in Selecciones del Reader's Digest between March 1950 and May 1959. He reported that one of them, published in September 1954, noted that "'13 unrelated studies have been done on the relationship between cancer and tobacco in five differen[t] countries . . . all these researchers reached the same conclusion: lung cancer appears more frequently among smoker[s] than among non-smokers.'" (citing "Lo que se sabe del cigarillo y el cáncer," Selecciones del Reader's Digest, September 1954).  He stated that another article, published in February 1953, referenced a study concluding that "'From the age of 45 onward, the danger of acquiring the illness

-13-

[lung cancer] increases in direct proportion to the amount of tobacco smoked . . . .'" (citing "Cáncer por cajetillas," Selecciones del Reader's Digest, February 1953). He also cited more than a dozen articles in the newspaper El Mundo during the 1950s referring to smoking and health, including specifically the relationship between smoking and cancer, and he pointed to similar coverage in the early 1960s in both El Mundo and the San Juan Star.

According to Martínez, the issue of addiction also received specific attention in both periodicals and newspapers. He cited a 1952 article in El Mundo that noted the difficulties of quitting smoking and that "the seductive qualities of tobacco are doubtless owing to the effect of the nicotine it contains." (citing "Sobre café y tabaco," El Mundo, April 24, 1952). He stated that other references to the difficulty of quitting smoking appeared in "[p]opular and widely circulating magazines" such as Selecciones del Reader's Digest and Alma Latina, and the footnote corresponding to that statement listed twelve sources (including the nine Reader's Digest articles noted above) addressing that topic and/or the general issue of smoking and health, including the link to lung cancer. Martínez also pointed to newspaper advertisements for "stop smoking methods" and "highly publicized" anti-smoking campaigns in the 1960s and 1970s that included educational workshops to help smokers quit – messages that implicitly, if not explicitly, communicated smoking's addictive nature. Educational

-14-

information reviewed by Martínez included a 1944 junior high school health education bulletin directing teachers to stress to students that tobacco is habit-forming and that smoking, once started, is difficult to quit

In light of these contrasting expert reports, we agree with the district court that no reasonable jury, confined to the record, could conclude that the general public in Puerto Rico lacked knowledge about the risks of smoking, including lung cancer, by the time decedent first started smoking in 1960.[6] A reasonable juror could not reject Martínez' detailed and comprehensive report in favor of Ferrer's conclusory and incomplete assessment. As was the case with his testimony in Cruz Vargas, "Martínez' research followed an accepted method of historical analysis and drew on a breadth of sources . . . contemporaneous with the time period at issue in the case," 348 F.3d at 278. Ferrer's attempt to neutralize the significance of the information disseminated on smoking and health by focusing on Puerto Rico's literacy problems falls short given Martínez' credible assertion of Puerto Rico's oral tradition. Indeed, Martí.nez' opinion was validated by the

---

[6] Appellants claim in their brief that Puerto Rico utilizes a "more stringent" approach to the common knowledge doctrine, requiring a finding in this case that consumers were aware not simply that cigarette smoking is hazardous to health but of "the specific connection between smoking and lung cancer (the disease that caused decedent's death) and/or the addictive nature of cigarettes." To the extent this is a correct statement of Puerto Rico law, an issue we do not reach, it does not affect our conclusion because Martínez' analysis met that standard.

-15-

testimony of García's wife that she knew at the time he started smoking that cigarettes posed a health risk – and that she told him so.

We therefore agree with the district court that, in failing to show a lack of common knowledge of the risks of smoking – and in particular, the risk of lung cancer – appellants offered insufficient evidence to support either their failure-to-warn or design defect claims.

B. Other Elements of the Tort Claims

We note, moreover, that plaintiffs' evidence also fell short of demonstrating the requisite proximate cause between either a failure to warn or design defect and decedent's death from lung cancer. As detailed above, decedent chose to disregard his family's and friends' repeated admonitions that he give up cigarettes because of the health risk, stating his intention to continue smoking despite its link to disease and death because "we all have to die some time from something." This attitude was expressed notwithstanding the explicit warning on cigarette packages, beginning in the mid-1980s, that smoking causes lung cancer and other serious diseases. Thus, on this record, warnings appear irrelevant to decedent's decision-making.[7] Accord Estate of

---

[7] Nor are appellants aided by the fact that the package warnings were in English, a language decedent did not speak. His exposure to the label information was inevitable given the evidence that he regularly watched the evening news, and he presumably was exposed to the information as well through word-of-mouth.

White v. R.J. Reynolds Tobacco Co., 109 F. Supp.2d 424, 435 (D. Md. 2000) (proof that decedent ignored verbal warnings and warning labels on cigarette packages shows lack of proximate cause for decedent's cigarette-related injuries); see Glassner v. R.J. Reynolds Tobacco Co., 223 F.3d 343, 351-52 (6th Cir. 2000) (finding that common knowledge doctrine bars design defect and failure-to-warn claims under Ohio product liability law where "decedent began smoking in 1969 [after the federal labeling act was in effect] and continued to smoke up until her death in 1997," affirming earlier precedent focusing "not on the point at which the plaintiff began smoking, but rather, the point at which she quit smoking").

In addition, the contention that nicotine's addictive nature rendered decedent incapable of stopping once he started smoking – a point asserted but undeveloped in appellants' brief – is belied by the testimony of his wife and daughter that he stopped near the end of his life because he no longer could afford the cost of cigarettes. Although he briefly tried nicotine patches and gum provided by family members, the evidence that he deliberately chose to continue smoking despite its life-shortening effect undermines the genuineness of those attempts to stop and, thus, their probative value. In sum, the evidence taken as a whole forecloses a jury finding that Reynolds' failure to warn of the health hazards of smoking before 1969 was a proximate cause of decedent's lung cancer. Cf. Tompkin v. American Brands, 219 F.3d 566, 568, 575

(6th Cir. 2000) (court reversed summary judgment for defendants on failure-to-warn and design defect claims based on factual question regarding common knowledge where decedent gave up smoking in 1965, at age 31, after smoking for 15 years).

Nor did decedent ever switch to available brands of cigarettes with lower levels of tar or nicotine in an effort to lower the risk to his health; he instead remained loyal throughout his life to regular Winstons.  Thus, Reynolds' failure to develop a "healthier" cigarette design also could not be deemed the cause of his illness and death.

For these reasons as well, appellants' failure-to-warn and design defect claims were properly dismissed.[8]

C. <u>Remaining Claims</u>

Appellants also asserted a fraud claim and a claim under Article 189 of the Puerto Rico Criminal Code, which punishes "[f]raud in delivery of [a] thing," 33 P.R. Laws Ann. § 4307.[9]  The district court found no allegations of reliance to support the fraud claim, <u>see</u>, <u>e.g.</u>, <u>Microsoft Corp.</u> v. <u>Computer Warehouse</u>, 83 F. Supp.2d 256, 262 (D.P.R. 2000) (listing elements of fraud under

---

[8] The district court also relied on preemption doctrine to dismiss appellants' claims.  As our discussion so far fully resolves the issues, we see no need to engage in additional analysis.

[9] Section 4307 provides, in relevant part: "Any person who defrauds in the substance, quality or quantity of the thing he delivers by virtue of an obligation in order to secure an undue profit for himself or a third party shall be punished . . . ."

Puerto Rico law); <u>Wadsworth, Inc.</u> v. <u>Schwarz-Nin</u>, 951 F. Supp. 314, 323 (D.P.R. 1996) (same), and appellants do not dispute that omission. Instead, they argue that the court erred by considering only fraud by misrepresentation and not fraud by concealment, a concept of Puerto Rico law known as "dolo" that does not require proof of detrimental reliance on false representations.

As appellants acknowledge, however, "dolo" is a form of contractual deceit, <u>see</u> <u>Generadora de Electricidad del Caribe, Inc.</u> v. <u>Foster Wheeler Corp.</u>, 92 F. Supp.2d 8, 18-19 (D.P.R. 2000); <u>P.C.M.E. Commercial, S.E.</u> v. <u>Pace Membership Warehouse, Inc.</u>, 952 F. Supp. 84, 92 (D.P.R. 1997); <u>Fournier</u> v. <u>Eastern Airlines, Inc.</u>, 655 F. Supp. 1037, 1039 (D.P.R. 1987), and there are neither allegations nor evidence to support a contractual relationship between appellee Reynolds and the decedent. "Dolo" is thus inapplicable in these circumstances.

Appellants' claim under Article 189 fares no better. Their argument for liability under this provision presumes a contractual relationship under which Reynolds was obliged to deliver a safe product. As noted above, however, the basis for such a contractual obligation was not alleged. Appellants offer no legal support for their implicit assertion that the purchase of a consumer product, without more, can establish a contractual relationship; nor have they explained how Reynolds' sale of Winston cigarettes to the decedent failed to fulfill any specific promises made to him

regarding the "substance, quality or quantity" of the product to be delivered.  Article 189, like "dolo," is simply inapt.

For the forgoing reasons, the judgment of the district court is affirmed.