ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL VI

| | | |
|---|---|---|
| JESÚS M. SOSA CARRASQUILLO<br><br>Recurrido<br><br>v.<br><br>FELIPE COLÓN SERVICE CORP.<br><br>Recurrente | KLRA202300617 | *Revisión Administrativa* procedente del Departamento de Asuntos del Consumidor Región de Caguas<br><br>Querella núm.: CAG2022-0003273<br><br>Sobre: Contrato de obras y servicios |

Panel integrado por su presidenta, la Jueza Ortiz Flores, el Juez Rivera Torres y la Jueza Rivera Pérez

Ortiz Flores, Jueza Ponente

## SENTENCIA

En San Juan, Puerto Rico, a 30 de enero de 2024.

Felipe Colón Service Corp. comparece ante este Tribunal de Apelaciones mediante el recurso de revisión administrativa en el que solicita la revocación de una *Resolución* dictada el 31 de octubre, notificada el 1 de noviembre de 2023, por el Departamento de Asuntos al Consumidor (DACO). Por medio de este dictamen administrativo, la agencia concluyó que la parte recurrente incurrió en imprudencia concurrente junto al recurrido, Jesús M. Sosa Carrasquillo. Por consiguiente, ordenó a Felipe Colón Service Corp. a pagar $11,437.50 dólares al Sr. Sosa Carrasquillo.

Por los fundamentos a continuación, se confirma la resolución recurrida.

**I**

El Sr. Sosa Carrasquillo presentó una querella en contra de Felipe Colón Service Corp. ante el DACO. En esencia sostuvo que contrató al recurrido para que le proveyera hormigón de 4,000 PSI para colocar un falso techo en una estructura de su propiedad. Sin embargo, alegó que la resistencia del hormigón provisto por el recurrente no fue conforme a lo

pactado.[1] Por consiguiente, reclamó la indemnización de lo pagado por el material más los gastos incurridos, entre estos el alquiler de madera y gatos que sustentaban la estructura, gastos de fumigación, demolición y la nueva construcción del techo de hormigón.[2] Por su parte, el entonces querellado respondió que los empleados contratados por el Sr. Sosa Carrasquillo desconocían el manejo adecuado, que estos añadieron agua al producto y lo instalaron incorrectamente.[3]

La agencia celebró vista administrativa durante el 20 de abril de 2023 y el 6 de junio de 2023, en la que las partes tuvieron oportunidad de presentar evidencia. Así pues, DACO dictó una resolución en la que realizó las siguientes determinaciones de hechos:

1. La parte querellante Jesús Sosa es propietario de un solar con una estructura en hormigón en el pueblo de Vieques. Dicha estructura es una construcción en progreso de una residencia en bloques y hormigón de tres (3) niveles.

2. El querellante reside en la propiedad en el nivel inferior.

3. El querellante contrató con la parte querellada, Felipe Colón Services Corp.[4] a través de la Sra. Diana Rivera, para que la colocación "tiro" de hormigón en el falso techo de la estructura. Dicho hormigón, según acordado debía ser de 4,000 PSI.

4. Las partes acordaron el monto total de $3,000.00 dólares por 22 yardas de hormigón, para el 6 de junio de 2022. Dicha cantidad fue pagada en su totalidad por la parte querellante.[5]

5. Previo al tiro de hormigón, el querellante había alquilado madera y gatos para instalación del falso techo.

6. La Sra. Diana Reyes es quien personalmente va con el camión a depositar/colocar el hormigón y la acompañaba su empleado. Se hizo un primer vaciado de 11 de yardas, y posteriormente se depositaron las 11 yardas restantes.

7. El Sr. Jesús Sosa estaba presente ese día, pero al momento del primer "tiro" de hormigón estaban solo dos empleados trabajando en el techo.

8. Dichos empleados/constructores solicitan se echara un poco más de agua a la mezcla. Posteriormente en la segunda "tirada" solicitan nuevamente se eche más agua al hormigón

---

[1] Apéndice del recurso de revisión, *Resolución*, Anejo II, en la pág. 3, determinación núm. 14.
[2] *Id.*, a la pág. 9.
[3] *Id.*, a la pág. 4, determinaciones núm. 16 y 17.
[4] Corporación Doméstica Activa #167226, con fines de lucro.
[5] Se hizo un depósito inicial de $1,325 al comienzo de la obra y se saldó el remanente al culminar la misma.

a lo que personal de la parte querellada se niega y les dice que utilicen el rastrillo.

9. No se presentó ningún contratista, ingeniero o encargado de obra con la Sra. Diana Rivera, al momento del tiro del hormigón.

10. El mismo día que se deposita el hormigón se hace una prueba de concreto para laboratorio.

11. El querellante declara que varios días luego de haber depositado el hormigón del techo, recibe una llamada del laboratorio Concrelab indicándole que no quitara o "descimbrara" la madera.

12. De dicho laboratorio le informaron que, en las pruebas de cilindro realizadas, el cemento no cumplía con la resistencia requerida.

13. Se realizó además una prueba donde se introduce un clavo al hormigón para detectar/medir su dureza. Dicha prueba arrojó que el clavo penetró en el hormigón con bastante facilidad.

14. El querellante radicó la querella de epígrafe el 27 de junio de 2022 en la que alega la resistencia del hormigón no es de 4,000psi, según pactado, por lo que solicita se remueva el hormigón, se deposite uno nuevo y se cubran gastos de alquiler de madera y alojamiento en lo que se corrige la situación.

15. El querellante reclama a la firma querellada, pero esta le responde que como el caso ya estaba radicado en DACO, no dialogaría con la parte querellante.

16. La parte querellada contesta la querella radicada e indica, en términos generales, que los empleados del querellante que estaban trabajando en el techo no sabían mucho, que pidieron se le echara más agua a la mezcla, que no estaba el Sr. Sosa y que a ese momento no había ningún contratista u otra persona encargada del manejo del curado del techo.

17. Añadió además la parte querellada que en menos de diez (10) días se estaba martillando clavos en el cemento depositado, que había una máquina de hacer mezcla en el techo, y que estaban colocando madera sobre el mismo, esto sin haber transcurrido el tiempo de curación de hormigón de aproximadamente de 28 días mínimos.

18. La parte querellante contrató posteriormente la firma Enzo Group, LLC donde el Ing. Noel A. Pérez hace una inspección se genera un informe pericial.

19. Dicho informe confirma baja resistencia del hormigón y recomienda demoler el hormigón depositado por lo que habría que reponer todo el acero y varillas utilizadas.

20. Al día de la vista administrativa el techo estaba aun con las maderas y gatos puestos y alegó el querellante que dicha madera tiene comején.

21. El querellante declaró que la propiedad está en peores condiciones y que la situación o consecuencia de que el techo no tenga la resistencia solicitada lo tiene preocupado y ansioso. Declaró además el querellante que se esmeró para construir su propiedad adecuadamente.

22. El perito, Ing. Noel A. Pérez declaró por su parte que de acuerdo con los cálculos de las pruebas del laboratorio Concrelab, el hormigón depositado tenía una resistencia menor a 2,000psi, esto muy por debajo de lo requerido y solicitado para el tipo de estructura construida por el querellante.

23. Testificó además dicho perito, que no podía determinar la causa más probable del por qué el hormigón tenía una resistencia baja, pero indicó que si la mezcla no fue la especificada, entiéndase fue alterada en algunos de sus componentes como por ejemplo agua, esto pudo haber provocado que la resistencia del hormigón fuera menor a la esperada.

24. La parte querellada, Sra. Diana Rivera declaró por su parte que la mezcla de hormigón fue la correcta, que los empleados del querellante solicitaron se echara más agua y que no había ningún profesional encargado, ningún contratista o ingeniero supervisando en ese momento. Que los empleados allí presentes del Sr. Sosa volvieron a solicitar se echara más agua para el segundo vaciado de las restantes 11 yardas de hormigón, pero esta se negó advirtiéndole precisamente que no se podía alterar más la mezcla.

La agencia administrativa concluyó que entre las partes se había perfeccionado un contrato de compraventa que gozaba de todos los requisitos de ley para reconocer su validez.[6] DACO determinó que los empleados del recurrido solicitaron echar más agua al producto pero que la parte recurrente les informó que no lo hicieran y que, en cambio, utilizaran el rastrillo.[7] Asimismo, la agencia escuchó el testimonio de un perito quien declaró que el cemento no tenía la resistencia de 4,000 PSI según pactada, y que no podía determinar la causa de la disminución de resistencia pero que el exceso de agua pudo haber sido determinante para alterar su composición.[8]

Sin embargo, DACO razonó que, Felipe Colón Service, Corp. "debió haber sabido por su parte que el echarle más agua a la mezcla alteraría su composición por lo que debió haber advertido de dicha consecuencia".[9]

---

[6] *Resolución*, Apéndice del recurso de revisión, Anejo II, en la pág. 7, párrafo núm. 1.
[7] *Id.*, en la pág. 7, párrafo núm. 2.
[8] *Id.*, en la pág. 8, párrafo núm. 3.
[9] *Id.*, en la pág. 8, párrafo núm. 4.

Además, la agencia tuvo ante sí la factura de servicio en la que la empresa recurrente advirtió dicha situación, no obstante, dicha factura no fue firmada por el Sr. Sosa Carrasquillo.[10] Así las cosas, la agencia determinó que la parte recurrente tenía pleno conocimiento de la consecuencia de alterar la mezcla echando más agua y no lo informó.[11] Pero, encontró "que es igual de responsable el querellado por no haber tenido un supervisor cualificado que inspeccionara y estuviera a cargo de la obra durante el depósito de hormigón".[12] Por lo cual, determinó que ambas partes fueron negligentes en la consecución de sus obligaciones, equivalente al 50% correspondiente a cada una de las partes.[13] Ordenó a la parte querellada el pago de $11,437.50 dólares.

Inconforme, Felipe Colón Service, Corp. presentó el recurso administrativo de epígrafe en el que nos señala que DACO cometió el siguiente error:

> Erró el Honorable DACO al imputar imprudencia concurrente a ambas partes cuando el daño se debió a la negligencia exclusiva del querellante quien añadió agua a la mezcla luego de que la querellada cumpliera su obligación de entregar el cemento que ya había sido pesado y medido y puesto a dispo[si]ción de éste por lo que ya pertenecía al querellante y como tal corría con el riesgo.

Por otro lado, el recurrido presentó su *Réplica a la solicitud de revisión de la parte apelante querellada*, mediante la cual señaló que las decisiones de los organismos administrativos merecen deferencia. Particularmente, sostuvo que, conforme a las determinaciones de DACO, la parte recurrente fue negligente ya que no supervisó diligentemente el vertido del concreto y por tanto incumplió la obligación pactada. Finalmente, sostuvo que contrario a la conclusión de la agencia, procedía adjudicar responsabilidad total a la parte recurrente puesto que esta es una corporación que debía tener la experiencia suficiente para brindar las instrucciones debidas y la supervisión que conlleva este tipo de construcción.

---

[10] *Id.*, en la pág. 8, párrafo núm. 5.
[11] *Id.*
[12] *Id.*
[13] *Id.*, en la pág. 10, párrafo núm. 3.

**II**

**A**. **Revisión judicial**

La *Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico*, Ley Núm. 38-2017, según enmendada, 3 LPRA 9601, *et seq.* (LPAU) establece los estándares de revisión judicial de órdenes, resoluciones y providencias dictadas por las agencias administrativas. Es norma reiterada que las decisiones de los organismos administrativos merecen la mayor deferencia judicial, puesto que estos cuentan con el conocimiento particularizado sobre los asuntos que le son encomendados. *The Sembler Co. v. Mun. de Carolina*, 185 DPR 800, 821 (2012). Al revisar una adjudicación administrativa el criterio rector de los tribunales revisores será la razonabilidad de la actuación de la agencia. *González Segarra et al. v. CFSE*, 188 DPR 252, 276 (2013). "El expediente administrativo constituirá la base exclusiva para la acción de la agencia en un procedimiento adjudicativo y para la revisión judicial ulterior." *Torres v. Junta Ingenieros*, 161 DPR 696, 708 (2004).

Conforme a la Sección 4.5 de la LPAU, (1) "el tribunal podrá conceder el remedio apropiado si determina que el recurrente tiene derecho a un remedio", (2) "[l]as determinaciones de hechos de las decisiones de las agencias serán sostenidas por el tribunal, si se basan en evidencia que obra en el expediente administrativo", y, "[l]as conclusiones de derecho serán revisables en todos sus aspectos por el tribunal". 3 LPRA sec. 9675. Además, las adjudicaciones y determinaciones de hechos que realizan las agencias están cobijadas por una presunción de regularidad y corrección, por lo cual la intervención judicial se limita a determinar si se encuentra evidencia sustancial en el expediente judicial para sostener la conclusión de la agencia o si esta actuó de manera arbitraria, caprichosa o ilegal. *Vélez v. A.R.Pe.*, 167 DPR 684, 693 (2006). Por lo cual, corresponde a la parte recurrente presentar evidencia necesaria para descartar dicha presunción de corrección sobre la determinación de la agencia. *Camacho Torres v. AAFET*, 168 DPR 66, 91 (2006). Esta presunción de corrección cede en los

siguientes casos: (1) cuando no está basada en evidencia sustancial; (2) cuando el organismo administrativo ha errado en la aplicación de la ley, y (3) cuando ha mediado una actuación irrazonable o ilegal. *Otero v. Toyota*, 163 DPR 716, 729 (2005).

Respecto a las conclusiones de derecho que realizan las agencias, a pesar de que los tribunales podemos revisarlas en todos sus aspectos, no se pueden descartar libremente las conclusiones e interpretaciones de la agencia. *JP, Plaza Santa Isabel v. Cordero Badillo*, 177 DPR 177, 187 (2009). Esto ocurre especialmente cuando la agencia interpreta alguna disposición de una ley que esta administra. *Id.* Incluso, en aquellos casos en que quedan dudas en cuanto a que la interpretación de la agencia no es la única razonable, su determinación merece deferencia sustancial. *De Jesús v. Depto. Servicios Sociales*, 123 DPR 407, 417-18 (1989).

### B. Teoría de las obligaciones

En nuestro ordenamiento jurídico, "[e]l contrato es el negocio jurídico bilateral por el cual dos o más partes expresan su consentimiento en la forma prevista por la ley, para crear, regular, modificar o extinguir obligaciones". 31 LPRA sec. 9751. Sabido es que estos tienen fuerza de ley entre las partes, sus sucesores y ante terceros. *Id.* sec. 9754. Particularmente, el contrato de compraventa consiste en aquel en que "la parte vendedora se obliga a transferir a la parte compradora el dominio de un bien, y esta a su vez se obliga a pagarle un precio cierto". *Id.* sec. 9941. En este tipo de contrato, "[e]l riesgo por destrucción de la cosa vendida no se transmite al comprador, sino hasta que el vendedor la pone a disposición del comprador". *Id.* sec. 9964.

Mediante este tipo de contrato, el vendedor se obliga, entre otras, a: (a) Entregar inmediatamente el bien con sus accesorios, libre de todo gravamen, en el lugar y el tiempo convenidos o donde se encuentre el bien en el momento del otorgamiento; (b) transferir al comprador el dominio del bien; (c) garantizar al comprador que el bien vendido tiene las cualidades prometidas y que está libre de defectos que disminuyen o destruyen su

valor o la aptitud para su uso ordinario o convenido, y (d) proporcionar al comprador toda la información sobre el objeto vendido, especialmente la relacionada con los linderos, privilegios, y cargas. 31 LPRA sec. 9991. Por otro lado, el comprador en esencia se obliga a pagar el precio y los gastos relacionados a la compraventa. *Id*. sec. 9992.

Conforme a la teoría de las obligaciones, aquella persona que mediante culpa o neglicencia le causare daño a otra, viene obligada a repararlo. 31 LPRA sec. 10801. "[U]n daño no genera una causa de acción por negligencia si dicho daño no fue previsto, ni pudo haber sido razonablemente anticipado por un hombre prudente y razonable". *Colón y otros v. K-mart y otros*, 154 DPR 510, 517 (2001) (que cita a H. Brau del Toro, *Los daños y perjuicios extracontractuales en Puerto Rico*, 2da ed., San Juan, Pubs. J.T.S., 1986, Vol. I, Cap. VII, pág. 185). "[L]os conceptos *culpa y negligencia* equivalen al incumplimiento con el deber de cuidado, lo que a su vez concierne, en esencia, en no anticipar o prever las probables consecuencias de los actos, que hubieran sido previstas por una persona prudente y razonable". *Camacho Rivera v. Richard Mitchell, Inc.*, 202 DPR 34, 41 (2019).

Por consiguiente, es necesario que para reclamar el resarcimiento por los daños y perjuicios existan los siguientes elementos: (1) la existencia de un daño real; (2) el nexo causal entre el daño y la acción u omisión del demandado, y (3) el acto u omisión, el cual tiene que ser culposo o negligente. *Cruz Flores et al. v. Hosp. Ryder et al.*, 210 DPR 465 (2022). En cuanto a la culpa o negligencia, estos consisten en la falta del debido cuidado, bien sea que no anticipe o prevea las consecuencias racionales de un acto que una persona prudente anticiparía estando en las mismas circunstancias. *Pérez et al. v. Lares Medical et al.*, 207 DPR 965, 976 (2021).

Por otro lado, un producto defectuoso es el que "falla en igualar la calidad promedio de productos similares". *Rivera et al. v. Superior Pkg., Inc. et al.*, 132 DPR 115, 128 (1992). Respecto a estos, se han reconocido

tres tipos de defectos que conllevan la aplicación de la doctrina de responsabilidad estricta: (1) defectos de fabricación; (2) defectos de diseño; (3) defectos por insuficiencia en las advertencias o instrucciones". *González Cabán v. JR Seafood et al.*, 199 DPR 234, 241 (2017). En cuanto al defecto en las instrucciones, responde el vendedor por los daños ocasionados cuando los riesgos del uso del producto no son aparentes ni anticipables por el consumidor, que este sea inevitablemente peligroso o cuando no se corrobora la efectividad de las instrucciones. *Aponte v. Sears Roebuck de P.R., Inc.*, 144 DPR 830, 840 (1998). "Los objetivos al ofrecer información y advertencias sobre un producto son: (1) facilitar que el consumidor lo utilice sabiamente, reduciendo el riesgo de una posible lesión, y (2) promover la autonomía individual en el proceso decisional sobe la adquisición del producto". *Id.*, a las págs. 840-841. Así, corresponde al vendedor ofrecer información adecuada sobre el manejo del producto, advertir sobre los riesgos de su uso, y alertar sobre las consecuencias de usar el producto de forma incorrecta. *Id.*

Asimismo, responden vicariamente aquellos patronos privados por los daños que causan sus empleados en el servicio de las ramas en que los tengan empleados o con ocasión de sus funciones. 31 LPRA sec. 10805(d). La responsabilidad vicaria ocurre cuando se impone responsabilidad por la culpa o negligencia de uno a otra persona, entre estos el patrono que responde por los daños de su empleado. 31 LPRA sec. 10805; *Parrilla v. Ranger American of P.R.*, 133 DPR 263, 271 (1993).

Finalmente, el perjudicado de un daño que haya aportado mediante su imprudencia concurrente no queda eximido de responsabilidad, sino que "conlleva la reducción de la indemnización en proporción al grado de tal imprudencia". 31 LPRA sec. 10810. Con la concurrencia de culpas se individualizan las indemnizaciones por daños conforme a la porción del descuido o negligencia de las partes. Por tanto, para determinar la negligencia que corresponde a cada parte en casos de negligencia concurrente es necesario analizar y considerar todos los

hechos y circunstancias que mediaron en el caso, particularmente si ha habido una causa predominante. *Méndez Purcell v. A.F.F.*, 110 DPR 130, 135-136 (1980). Entiéndase, "el grado de negligencia desplegado por la parte demandante que contribuye a la producción de sus propios daños". *Colón Santos v. Coop. Seg. Múlt. P.R.*, 173 DPR 170, 178 (2008). Así, la aplicación de esta doctrina no exime de responsabilidad la reclamado, sino que reduce su grado de responsabilidad. *SLG Colón-Rivas v. ELA*, 196 DPR 855, 865 (2016).

La norma jurisprudencial de negligencia concurrente requiere que el juzgador, además de determinar el monto de la compensación que corresponde a la víctima, determine el porcentaje de responsabilidad o negligencia que corresponde a cada parte, reduciendo así la indemnización del demandante de conformidad con esta distribución de responsabilidad. *Quiñones López v. Manzano Pozas*, 141 DPR 139, 176 (1996). Así, los tribunales están llamados a individualizar el daño conforme a la proporción de descuido o negligencia. *Colón Santos v. Coop. Seg. Mult. P.R.*, supra. Conforme ha reconocido el Tribunal Supremo, en un recurso de revisión "el juzgador debe analizar la totalidad de las circunstancias de cada caso y hacer referencia a los precedentes con hechos similares". *Id.*, a las págs. 178-179.

### III

La parte recurrente sostiene que erró el DACO al imputar imprudencia concurrente cuando el daño se debió exclusivamente a la recurrida quien añadió agua a la mezcla del cemento. A su entender, cumplió su obligación conforme a lo pactado y transfirió toda responsabilidad sobre el producto al momento de la entrega de este. Por consiguiente, sostuvo que si hubo alguna deficiencia respecto al cemento esto se debió exclusivamente al manejo que le dio la parte recurrida. Por otro lado, la parte recurrida sostuvo que la única responsable era la parte recurrente puesto que incumplió su obligación al no supervisar

diligentemente la obra para cumplir las especificaciones requeridas para el tipo de obra.

Conforme surge del expediente ante nuestra consideración, DACO determinó como un hecho que los "empleados/constructores solicitan se echara un poco más de agua a la mezcla. Posteriormente en la segunda 'tirada' solicitan nuevamente se eche más agua al hormigón a lo que personal de la parte querellada se niega y les dice que utilicen el rastrillo".[14] Además, la agencia sostuvo que "[n]o se presentó ningún contratista, ingeniero o encargado de obra con la Sra. Diana Rivera, al momento del tiro del hormigón".[15] Asimismo, determinó que fue un hecho que "[l]a parte querellada contesta la querella radicada e indica, en términos generales, que los empleados del querellante que estaban trabajando en el techo no sabían mucho, que pidieron se le echara más agua a la mezcla, que no estaba el Sr. Sosa y que a ese momento no había ningún contratista u otra persona encargada del manejo del curado del techo".[16]

A su vez, el perito Ing. Noel A. Pérez declaró que "no podía determinar la causa mas probable del por qué el hormigón tenía una resistencia baja, pero indicó que si la mezcla no fue la especificada, entiéndase fue alterada en algunos de sus componentes como por ejemplo agua, esto pudo haber provocado que la resistencia del hormigón fuera menor a la esperada".[17] Finalmente, la Sra. Diana Rivera sostuvo que "la mezcla de hormigón fue la correcta, que los empleados del querellante solicitaron se echara más agua y que no había ningún profesional encargado, ningún contratista o ingeniero supervisando en ese momento. Que los empleados allí presentes del Sr. Sosa volvieron a solicitar se echara más agua para el segundo vaciado de las restantes 11 yardas de hormigón, pero esta se negó advirtiéndole precisamente que no se podía alterar más la mezcla".[18]

---

[14] *Resolución*, Apéndice del recurso de revisión, Anejo I, en la pág. 3, determinación núm. 8.
[15] *Id.*, determinación núm. 9.
[16] *Id.*, determinación núm. 16.
[17] *Id.*, determinación núm. 23.
[18] *Id.*, determinación núm. 24.

A la luz de estos hechos la agencia concluyó que la parte querellada, aquí recurrente, debió haber conocido que el echarle más agua a la mezcla alteraría su composición por lo que debió advertir al comprador sobre dicha consecuencia. Precisamente, fundamentó su decisión en la *Factura de servicio* donde se advertía sobre este peligro, pero dicho documento no fue firmado por el comprador, aquí recurrido. Por consiguiente, razonó que ambas partes contribuyeron al daño, uno por no advertir sobre el manejo correcto del producto y el otro por no tener un supervisor cualificado que inspeccionara el depósito y manejo del hormigón. Finalmente, concluyó que ambas partes fueron negligentes en partes iguales e impuso a la parte recurrente el pago del 50% equivalente a $11,437.50.

Según esbozamos anteriormente, nuestra intervención con la adjudicación de una agencia se limita a aquellos casos en los que esta aplicó la ley incorrectamente o cuando haya actuado de manera irrazonable. *Otero v. Toyota*, *supra*. Además, conforme al derecho aplicable el vendedor es responsable de la entrega del objeto de venta, garantizar que el bien vendido tiene las cualidades prometidas y libre de defectos que afecten su valor, y debe proporcionar al comprador toda la información sobre el objeto vendido. 31 LPRA sec. 9991. Por otro lado, el comprador debe recibir y pagar el precio y los gastos relacionados que conlleve el cumplimiento del contrato. *Id.*, sec. 9992.

En este caso, conforme a las determinaciones de hechos del DACO, la parte recurrente presentó la factura de servicio en la cual se expone lo siguiente:

> Se advierte que al añadir agua adicional al diseño afecta la resistencia y calidad del hormigón y anula nuestra garantía. He leído y entendido esta advertencia esto y requerido que se me añada agua a la mezcla bajo mi entera y absoluta responsabilidad asumiendo todos los riesgos envuelto inclusive la perdida de garantía.[19]

Sin embargo, dicha factura no estaba firmada por el cliente en el área provista para ello. Por consiguiente, dicha expresión de advertencia

---

[19] *Condiciones*, Apéndice del recurso de revisión, Anejo IV, en la pág. 17.

no puede tomarse por brindada a la parte recurrida. Bajo este fundamento, el DACO determinó que la parte recurrente fue negligente en el cumplimiento de su obligación, puesto que no ejerció su deber de informar al comprador. Además, según surge de las propias determinaciones de hechos de la agencia, los empleados/constructores solicitaron que se echara más agua al primer depósito del hormigón. Posteriormente, solicitaron nuevamente que se añadiera más agua, a lo cual personal de la parte recurrente negó que procedieran. En cambio, les exhortó a estos a que utilizaran el rastrillo.[20] De igual forma declaró la Sra. Diana Rivera en cuanto a que estos solicitaron añadir más agua a la mezcla y que, por parte del comprador, no estaba presente ningún supervisor en ese momento.

Examinado el expediente ante nuestra consideración, la prueba anejada no demuestra en qué momento se tomó la prueba de laboratorio que reflejó la falta de densidad en el objeto del contrato. Entiéndase, si dicha prueba se realizó antes de iniciar la mezcla del hormigón con el agua o si fue posterior a ello. El informe pericial del Ing. Pérez Sanfeliz indicó que las pruebas de compresión del hormigón vertido en el techo arrojaron resultados de 1,080 PSI, lo cual no cumplió con la resistencia requerida para el diseño de construcción. Además, el Ing. Noel Pérez estableció que no podía determinarse la causa próxima del por qué el hormigón tenía una resistencia baja, pero que el exceso de agua pudo haberlo provocado. Por consiguiente, no nos encontramos en posición para adjudicar si los daños se debieron exclusivamente a la parte recurrida.

Así las cosas, debido a que no podemos determinar si el objeto de compraventa cumplía los requisitos pactados al momento de la entrega, nos corresponde examinar si la parte recurrente consumó su obligación de instrucción al comprador. Precisamente, si la expresión de advertencia de su personal afectó el grado de negligencia que la agencia le impuso. Somos del criterio que la advertencia sobre el peligro de verter más agua sobre el

---

[20] *Resolución*, Apéndice del recurso de revisión, Anejo I, en la pág. 3, determinación núm. 8.

hormigón no fue suficiente para advertir y subsanar la falta de instrucción. Además, no ejerció parte de su obligación como vendedor de "proporcionar al comprador toda la información sobre el objeto vendido". 31 LPRA sec. 9991(e). Debido a la ausencia de la firma en la factura de compraventa, la parte recurrente no logró demostrar que dichas advertencias se impartieran debidamente al comprador, aquí recurrido. Por consiguiente, no probó la observancia total de su deber de instrucción respecto al objeto de compraventa. Además, su falta de advertencia respecto al manejo del producto convirtió el hormigón en un producto inherentemente peligroso.

Su acatamiento parcial respecto a dicha obligación conlleva la imposición de responsabilidad civil por su negligencia en el cumplimiento de sus obligaciones contractuales. Entiéndase, la advertencia respecto al agua no alcanzó el nivel de instrucción exigido por nuestro ordenamiento. Nótese que dicha indicación se limitó a detener una acción del comprador, sin proveerle información completa respecto al manejo del objeto de compraventa. El dictamen merece nuestra deferencia porque se sostiene en la evidencia sustancial aquilatada por la agencia recurrida y ser razonable.

**IV**

Por los fundamentos esbozados, se confirma la *Resolución* del DACO.

**Notifíquese.**

Lo acordó el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís<br>
Secretaria del Tribunal de Apelaciones